**PACIFIC FAR EAST LINE, INC.**

v.

**The UNITED STATES.**

**No. 214–70.**

United States Court of Claims.

March 19, 1975.

Mark P. Schlefer, Washington, D. C., Atty. of record, for plaintiff; J. Franklin Fort, T. S. L. Perlman, Leonard Egan, Stephen T. Owen, and Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Valentine Brookes filed a brief for Pacific Transport Co. and subsidiaries as amicus curiae; Lawrence v. Brookes, Brookes, Brookes & Vogl, of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

COWEN, Chief Judge:

This case is presented on cross motions for partial summary judgment and raises only one of three primary questions found in plaintiff's petition. The basic issue before us here is identical to the one found in its companion case of Lykes Bros. Steamship Co. v. United States, 513 F.2d 1342 decided today. As in *Lykes Bros. Steamship Co.,* we have a taxpayer who claims the seven percent investment credit on its entire basis in certain vessels. As in *Lykes Bros. Steamship Co.,* taxpayer has been allowed only a restricted credit, based on its post-1961 costs, because of defendant's interpretation of section 48(b) of the Internal Revenue Code of 1954.[1] Since our decision in *Lykes Bros. Steamship Co.* discusses in detail the proper criteria for determining whether property has been constructed "by the taxpayer" under section 48(b)(1) and the applicable Treasury regulations, our opinion here will be confined to the application of that test to the facts of this case. For the reasons stated below, we grant plaintiff's motion for partial summary judgment. Findings on the amount of plaintiff's recovery are reserved pending determination of the remaining portions of plaintiff's petition.

Pacific Far East Line, Inc. is a Delaware corporation engaged in business as a common carrier by water in the foreign commerce of the United States. In 1962, plaintiff accepted delivery of two new vessels, the *Philippine Bear* and the *China Bear,* for use in its transpacific common carrier service between ports in California and those in the Far East. The two vessels were constructed, with aid from the construction-differential subsidy program (CDS), pursuant to a single contract dated September 22, 1959 (FMB–100). Plaintiff financed its portion of the costs of the vessels in accordance with Section 504 of the Merchant Marine Act of 1936, as amended.[2] 46 U.S.C. § 1154 (1964). The 1959 agreement was entered into by the taxpayer, the United States (represented by the Federal Maritime Board),[3] and Bethle-

---

1. All section references in this opinion are to the Internal Revenue Code of 1954, unless otherwise noted. All statutory references refer to applicable provisions in force in 1962.

2. Plaintiff had acquired its fleet of standard dry cargo vessels previously by straight purchase from the Government of Government-built Mariner ships. It was only because the Government's inventory was exhausted that plaintiff contracted directly with Bethlehem under section 504 to have the vessels built.

3. The CDS program has been administered at various times by the Federal Maritime Board and the Maritime Administration, and these agencies are referred to in this opinion collectively as "Maritime".

hem Steel Company (Bethlehem) for construction of two vessels at Bethlehem's shipyards in San Francisco, Calif. Since the ships were built under the CDS program, approval by Maritime of the construction plans was required. Pursuant to Article I of the Special Provisions of the contract, Bethlehem promised it would perform all the work necessary to construct the vessels "in strict accordance with the Plans and Specifications," which were attached to and made part of the agreement. The ships were delivered by Bethlehem to plaintiff only after completion of all construction work, and after the vessels had passed the many tests, trials and inspections mandated by the contract.

While the foregoing facts are similar to those found in *Lykes Bros. Steamship Co.*, our present case differs somewhat in the manner in which the contract Plans and Specifications were developed, and the factual background covering this area requires a more detailed presentation. After World War II, Maritime developed a design for a new cargo vessel unofficially known as the Mariner and designated as C4–S–1a under the Maritime Administration's classification system.[4] The standard contract Plans and Specifications for the Mariner were prepared for Maritime by Bethlehem shortly before the Korean War.[5] Initially, Maritime contracted for the construction of 35 Mariners, to be built between 1951 and 1954. However, not all of the vessels retained the C4–S–1a design designation, since 33 of the ships were sold to private industry, normally after a period of service with the Military Sea Transportation Service. Occasionally, these private owners modified the Mariners,

usually with respect to cargo handling gear and passenger quarters, to suit their different trade requirements, and in so doing received different design designations for their vessels. For example, three of the Mariners were bought by plaintiff, and designated as C4–S–1f. However, all the vessels bought by private operators from the Government kept the same basic design as the original C4–S–1a models in such features as size, speed, power, and appearance up to the weather deck, and continued to be recognized as Mariners.

By 1957 the disposition of the original group of 35 Mariners was completed. In 1959, when plaintiff was contractually obligated under a new operating-differential subsidy agreement to replace two of its older cargo ships, plaintiff used Section 504 of the Merchant Marine Act to finance construction of the new vessels. There is evidence to show that the specifications for the new vessels were directly based on the Mariner design which had been developed by Maritime. In an affidavit presented on plaintiff's behalf, E. Scott Dillon, a naval architectural consultant formerly employed by Maritime, concludes:

> Pacific Far East Line, Inc.'s two dry cargo ships built between 1959 and 1962 by Bethlehem Steel Company in accordance with design C4–S–1t, Maritime Administration Hull Numbers 89 and 90, were clearly within the Mariner class of vessels. In my opinion, design C4–S–1t is directly based upon the prototype Mariner design C4–S–1a. Pacific Far East Line's subject vessels are properly described as Mariner class vessels, having the original hull form,

---

4. The components of this design designation have the following significance: "C" indicates a cargo vessel; "4" refers to a vessel between 500 and 550 feet in length; "S" means a steamship with accommodation for 12 or fewer passengers; "1" signifies that this was the first such design developed by Maritime; "a" indicates that this specific design is the first in a series depicting the same basic vessel.

5. Maritime started the Mariner construction program to prevent the obsolescence of the

entire American merchant fleet, which by 1951 consisted primarily of ships built before World War II. This program was begun to promote the construction of modern vessels to meet our national defense needs, to give domestic shipyards experience in building modern vessels so that they could accomplish a large-scale construction program in time of emergency, and to preserve America's shipbuilding industry and facilities.

dimensions, speed, and power characteristics.

The total cost of the two vessels was $27,931,945, of which $14,558,924.66 was paid by plaintiff. For tax years 1962, 1963, and 1964, the period at issue in this litigation, plaintiff computed its tax credit based on its entire share of the cost of the two vessels. On audit, the Service concluded, in part, that plaintiff's entitlement to the credit was restricted under section 48(b)(1) to that portion (15.3 percent) of its total basis in the vessels attributable to post-1961 construction costs. Accordingly, deficiencies were assessed by the Service [6] and were paid by plaintiff. On April 30, 1970, the Service disallowed taxpayer's refund claims. Plaintiff then filed its petition in this court to recover taxes in the amount of $791,927.60, plus interest.

As we held in *Lykes Bros. Steamship Co.,* property is constructed "by the taxpayer" under section 48(b)(1) only if we find that the taxpayer possesses the right to control the details of the construction process. In that case, we also held that the question whether the ships were constructed in accordance with taxpayer's specifications, within the meaning of Treasury Regulation 1.48–2(b)(1), is to be determined largely by the extent of the Government's supervision and control. In this case, plaintiff has shown, even more conclusively than was done by the taxpayer in *Lykes Bros. Steamship. Co.,* that plaintiff did not have the right to exercise and did not in fact maintain the degree of control necessary to place the construction of the property within the provisions of section 48(b)(1).

The degree of Government control over the details of this construction contract was even more pervasive than it was in *Lykes Bros. Steamship Co.* Pursuant to the CDS program, Maritime was required to approve the final contract Plans and Specifications, to supervise the awarding of the construction contract, to approve any revisions by Bethlehem of the Plans and Specifications, and to test the vessels after construction for compliance with the contract. Only after the vessels had passed all of the post-construction tests could plaintiff actually take delivery of the ships. In this case, however, the Government played a larger role in designing the vessels than in *Lykes Bros. Steamship Co.* As shown by Mr. Dillon's affidavit on this issue, the design for the ships was developed some years before their construction by Bethlehem and Maritime; plaintiff merely requested Maritime to approve certain minor modifications of this model so that the completed vessel would more nearly meet its commercial needs.

■ It should be noted that defendant has not contested Mr. Dillon's affidavit by an opposing affidavit, deposition, or documentary evidence. Instead, it merely asserts in its brief that it "dispute[s] taxpayer's assertion that the ships were built to Government specifications." Defendant's Reply Brief, at 21. Defendant contends that the mere similarity between fundamental design and basic characteristics such as size, speed, power and general appearance does not demonstrate that the Government established the performance characteristics of the ships or the type of materials to be used in construction. Defendant's assertion is merely that the vessel modifications *may* have been so extensive as to change the overall style of the ships in question. On this ground, defendant asks us to

---

**6.** A number of the deficiencies asserted in the Service's deficiency report are unrelated to the investment tax credit issues involved in this litigation. The report also raised two additional issues regarding the taxpayer's claimed investment credit for the construction of the two ships. The Service asserted (1) that the taxpayer had improperly included in its basis amounts it had paid for the vessels out of statutory tax-deferred reserve funds and (2) that the Service could recapture the investment credit to reflect the taxpayer's use of the tax-deferred funds to pay off purchase money mortgages placed on the vessels. Both of these questions involving the taxpayer's use of tax-deferred funds are at issue in this refund suit, but they are not subject to the motions for partial summary judgment.

"remand to the Trial Judge for taking of proof" on the issue. This tactic by defendant is not adequate to preserve a dispute of fact for determination by trial. Rule 101(f) states:

* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, will be entered against him.

Our case law is to the same effect. As we held in Hartwig v. United States, 485 F.2d 615, 620, 202 Ct.Cl. 801, 810–11 (1973):

* * * Summary judgment proceedings of the type now before the court are designed to pierce the pleadings in an attempt to dispose of sham or paper issues. F. James, Civil Procedure § 6.18 (1965). This can only be accomplished where the parties are required to supply depositions or affidavits to support their allegations or denials. This is the view taken by our Rule 101(f). A party is not free to simply rest on the general allegations or denials in its pleadings when contesting a motion for summary judgment. * *

See Royal Indemnity Co. v. United States, 371 F.2d 462, 465, 178 Ct.Cl. 46, 51–52 (1967), cert. denied, 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967).

■ Defendant's explanation for its failure to supply an affidavit of its own on this issue is simply not persuasive. Although the affidavit of Mr. Dillon does not refer, except in a footnote, to the word "specifications," the overall thrust and meaning of his testimony is obvious. It is clearly his conclusion that the two vessels in question were identical to the Government-designed C4–S–1a models, except for modifications regarding the internal arrangement of cargo space, passenger compartments and cargo gear. Furthermore, defendant cannot explain its failure to respond to plaintiff's affidavit by the fact that the parties had originally agreed to defer discovery procedures until after we reached a decision in Lykes Bros. Steamship Co. When the present case was scheduled for oral argument on its own, plaintiff claimed that its situation was stronger than Lykes Bros. Steamship Co. because its vessels were patterned directly on the Government's design. Defendant had an obligation to come forward and rebut Mr. Dillon's affidavit, the only direct piece of evidence on this point. Since defendant has failed to counter this affidavit, we must accept the truth of Mr. Dillon's statements in determining the degree of Government control over the details of the ship construction involved in this case.[7]

■ As in Lykes Bros. Steamship Co., the actual day-to-day construction of the vessels was accomplished by Bethlehem, an independent contractor, and not by the taxpayer. Bethlehem had exclusive dominion over the work site, which on this occasion was its San Francisco shipyard. It had substantial design responsibilities with respect to the ships and was required to develop numerous detailed working plans to aid in the actual construction. The contract explicitly provided, in Article 20 of the General Provisions, that "the workmen and employees upon the contract work shall at all times be employees of the Contractor or its subcontractors and shall not be employees of the Owner or [the Govern-

---

7. We should note, however, that in all likelihood defendant's mistake with regard to the affidavit is not one which changed this decision to its disfavor. Without an answering affidavit we have a situation similar to Lykes Bros. Steamship Co., where we found that the control factors demonstrated that the ships were not constructed "by the taxpayer." Furthermore, at oral argument counsel for defendant admitted that he had no specific knowledge of any evidence he could produce at trial to show that the modifications were so extensive that the ships as constructed were not similar to the original Mariner plans produced by the Government.

ment]." Bethlehem was also responsible for selecting all subcontractors, vendors, and suppliers for the construction project. The entire risk of loss for destruction of or casualty to the vessels fell upon Bethlehem during construction and prior to delivery. Finally, Bethlehem was responsible for manning the vessels during tests and sea trials, and for securing all necessary certifications required by Federal, state, and local law. In summary, Bethlehem built and delivered to plaintiff two complete, seaworthy, and totally operational dry cargo vessels. Indeed, the contract assigned no role to the taxpayer apart from removal of the vessels from the shipyard after completion and formal delivery. *See* Special Provisions, Article I(b).

For these reasons, we find that plaintiff's role in the construction of the two vessels was primarily a passive one. On the one hand, the basic contract plans were the product of Government draftsmen, and on the other, the design details required to construct the ships were supplied by Bethlehem. Bethlehem's overall responsibility and control for the day-to-day construction activities, along with the overwhelming degree of control exercised by the Government pursuant to the CDS program, demonstrates clearly that these ships were not constructed "by the taxpayer" under section 48(b)(1), nor in accordance with its specifications as provided in Treasury Regulation § 1.48–2(b)(1).

The property in question here was clearly "acquired" by plaintiff after December 31, 1961, pursuant to section 48(b)(2). The Certificates of Delivery establish beyond a doubt that the ships were "reduced to [taxpayer's] physical possession, or control" in 1962. *See* Treas.Reg. 1.48–2(b)(6). There is no question that the ships' "original use" occurred in 1962, after plaintiff took control of the vessels on their respective dates of delivery. Since the vessels do not fall within the provisions of section 48(b)(1) and do qualify for treatment under section 48(b)(2), plaintiff should have been allowed to use its entire basis in

the construction of the ships in determining the investment credit for the tax years in question.

For these reasons, plaintiff's partial motion for summary judgment is granted, defendant's cross-motion for partial summary judgment is denied and the case is remanded to the trial judge for a determination of the remaining issues in the case.