*1064
 
 JACK R. MILLER, Circuit Judge.
 

 This appeal is from a judgment of the United States Claims Court
 
 [1]
 
 in favor of the Government in a suit for refund of 1974 corporate income taxes of $572,772 and interest of $142,782.83 paid on an Internal Revenue Service assessment based on disallowance of a portion of the investment tax credit claimed on the 1974 return of Hawaiian- Independent Refinery, Inc. (“HIRI”) with respect to an oil refinery complex consisting of (1) the refinery, located thirteen miles from Honolulu in the Campbell Industrial Park, (2) an offshore tanker-mooring facility connected to the refinery by pipelines, and (3) pipelines for transport of refined petroleum products to HIRI’s storage facilities in the Honolulu area.
 
 [2]
 
 We affirm.
 

 The Investment Tax Credit
 

 The investment tax credit was initially provided by the Revenue Act of 1962 (Pub.L. No. 87-834, 76 Stat. 962), which added section 38 to the Internal Revenue Code of 1954 (“IRC”) allowing a tax credit for “qualified investment” in certain depreciable property, known as “new section 38 property” and limited
 
 [3]
 
 to property—
 

 (1) The construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or
 

 (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.
 

 In the Tax Reform Act of 1969 (Pub.L. No. 91-172, 83 Stat. 487, 660), section 703(a), Congress terminated the investment tax credit, excluding from the term “section 38 property” that property whose physical construction began after April 18, 1969. However, in section 101(a) of the Revenue Act of 1971 (Pub.L. No. 92-178, 85 Stat. 498), Congress restored the investment tax credit by adding section 50, IRC, which provides:
 

 § 50. RESTORATION OF CREDIT
 

 (a) General rule
 

 Section 49(a) (relating to termination of credit) shall not apply to property—
 

 (1) the construction, reconstruction, or erection of which—
 

 (A) is completed by the taxpayer after August 15, 1971, or
 

 (b) is begun by the taxpayer after March 31, 1971, or
 

 (2) which is acquired by the taxpayer—
 

 (A) after August 15, 1971, or
 

 (B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971.
 

 (b) Transitional rule
 

 In applying section 46(c)(1)(A) [defining “qualified investment”] in the case of property described in subsection (a)(lXA) the construction, reconstruction, or erection of which is begun before April 1, 1971, there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after August 15, 1971....
 

 Treasury Regulation § 1.50-l(c) provides that the “principles of [Regulation] § 1.48-
 
 *1065
 
 2(b) and (c) shall be applied in determining when property is
 
 acquired
 
 and in determining that portion of the basis of property properly attributable to construction, reconstruction, or erection after August 15, 1971.” (Emphasis added.) Regulation § 1.48-2(b) provides,
 
 inter
 
 alia—
 

 (1) Property is considered as constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with his specifications.
 

 (5) Construction, reconstruction, or erection by the taxpayer begins when physical work is started ....
 

 (6) Property shall be deemed to be acquired when reduced to physical possession, or control.
 

 In passing, we note the rationale for restoration of the investment tax credit in 1971 which is set forth in S.Rep. No. 437, 92d Cong., 1st Sess. 8 (1971), U.S.Code Cong.
 
 &
 
 Admin.News 1971, pp. 1825, 1924;
 

 H.R. 10947 provides substantial tax reductions to individuals and substantial tax incentives to business in order to bolster the economy.
 

 The committee report also states that—
 

 the credit is extended to property ordered on and after April 1, 1971, to avoid discrimination against those who took action on or after that date to acquire eligible assets on the basis of assurances as to the availability of the credit made by the Secretary of the Treasury, after consultation with the ranking members of the Congressional taxwriting committees. The assurance was given to avoid further deferment of investments which were already at an unduly low level.
 

 Id.
 
 at 8-9, U.S.Code Cong. & Admin.News 1971, pp. 1924-1925.
 
 See also
 
 H.R.Rep. No. 533, 92d Cong., 1st Sess. 5 (1971), U.S.Code Cong. & Admin.News 1971, p. 1829.
 

 CONTENTIONS OF THE PARTIES
 

 HIRI argues that it
 
 acquired
 
 the refinery after August 15, 1971, under a turn-key contract
 
 [4]
 
 and that the entire cost of the refinery complex qualified for the investment tax credit. The Government maintains that the trial judge correctly held that the refinery complex was
 
 constructed
 
 (not acquired) “by the taxpayer” for purposes of section 50(aXl)(A), IRC, and, therefore, as related above, that the cost basis of $13,-767,844 attributable to construction on or before August 15, 1971 (see
 
 supra
 
 note 2), was not eligible for the investment tax credit.
 

 BACKGROUND
 

 The Honolulu Gas Co., Ltd., which manufactured gas from fuel oil for distribution as a public utility, became interested during the 1960’s in expanding and diversifying its energy business by engaging in the refining and sale of other petroleum products. In early 1968, James Gary, president of the company, and Paul Joy, its vice president for engineering, met with John Evans, an independent petroleum industry consultant, to undertake the initial planning and organization of such a project. Representatives of Foster Wheeler Corporation (“Foster Wheeler”), a large engineering consulting firm experienced in oil refinery construction, were brought into the discussions and planning.
 

 As conceived, the refinery complex was to be a unitary facility consisting of three major components: a straight-run refinery; an offshore tanker-mooring facility located about two miles from the refinery, with an underwater/underground pipeline system connecting to the refinery; and two refined petroleum ■ products pipelines to transport jet fuels and multipurpose distillate produced by the refinery to various storage facilities in the Honolulu area. The refinery was to be built in an area to be designated a
 
 *1066
 
 foreign trade zone in order to avoid federal customs duties on the crude oil imports and state taxes on the refined products. It was to have an initial refining capacity of less than 30,000 barrels per day in order to qualify for a “small business” set-aside in Government procurement.
 

 In 1968, Honolulu Gas Co. separately incorporated HIRI to develop and operate the facility. HIRI selected the Campbell Industrial Park as the site for the refinery and obtained a 55-year lease of the property. The Federal Government granted an application by the Governor of Hawaii on the foreign trade zone matter, and HIRI obtained a foreign crude oil import allocation from the Secretary of the Interior. It also applied for the permits and licenses required for the proposed construction.
 

 Also in 1968, HIRI selected Foster Wheeler for its consultant in preparing preliminary studies on the engineering and economics of the refinery. Foster Wheeler also assisted HIRI in preparing plans and technical studies used to support the foreign trade zone application. Because HIRI did not have the personnel needed, it retained three engineering firms to serve as design engineers and construction supervisors: Foster Wheeler for the refinery; Bechtel, Inc., for the tanker-mooring facility; and an affiliate of Williams Brothers Engineering Co. for the products pipelines. As prime contractors for construction, HIRI retained Foster Wheeler for the refinery, Healy Tibbits Construction Co. for the tanker-mooring facility, and Hood Construction Co. for the products pipelines. HIRI also arranged for a foundation study, soil tests, and clearing and grading the refinery site.
 

 HIRI hired as its vice president and general manager Earl Beebe, a retired oil refinery operator with forty-eight years’ experience in refinery construction and operation, to oversee the design and construction of the entire facility, and, particularly, to see to it that the refinery being designed by Foster Wheeler would be efficient and would conform to HIRI’s purposes. He, in turn, hired Edward Quance, another experienced refinery operator, manager, process-designer, trouble shooter, and start-up engineer, as project engineer for the refinery, and Bruce Bean, a mechanical engineer who had previously worked on planning of the facility, as project engineer for the two offsite components. Mr. Quance’s duties included assisting Mr. Beebe by doing the engineering work needed to be sure that the Foster Wheeler designs and specifications were satisfactory and by auditing and inspecting Foster Wheeler’s work product. However, due to the vast amount of documentation produced by Foster Wheeler’s engineers and draftsmen, they could only check the drawings and specifications they deemed important and spot check others. From the latter part of 1970 until the refinery was placed in service in June of 1972, HIRI’s staff consisted of Messrs. Beebe, Quance, and Bean, a couple of marketing men, and some secretaries.
 

 ANALYSIS
 

 Lykes and Pacific Far East Line
 

 Of greatest precedential effect
 
 [5]
 
 on this court in this case are two Court of Claims cases:
 
 Lykes Bros. Steamship Co. v. United States,
 
 513 F.2d 1342 (1975), and its companion case,
 
 Pacific Far East Line, Inc. v. United States,
 
 513 F.2d 1355 (1975), in both of which it was decided that the taxpayer was entitled to the investment tax credit computed on its entire cost basis because, as held by the court, the vessels involved were
 
 acquired
 
 by the taxpayer after December 31, 1961, for purposes of section 38, IRC, added by the Revenue Act of 1962. As in this case, the Government contended that the involved property (vessels) was
 
 constructed
 
 by the taxpayer, much of it being done prior to the effective date of the investment tax credit. In explaining its disagreement with the Government’s position, the Court of Claims in
 
 Lykes,
 
 513 F.2d at
 
 *1067
 
 1351, said that “the right of control is the most important factor to be considered in determining whether the work is done for the taxpayer ‘in accordance with his specifications’.”
 
 [6]
 
 On the facts of each case, the court concluded that the taxpayer did not exercise sufficient control over construction. It observed that the Government (through the Federal Maritime Board) had an “overwhelming degree of control” over the contract at all stages from the beginning of construction to delivery of the vessels and that Maritime had the right to control the design specifications in every detail. It noted that, at all material times during construction, the contractor (shipbuilder) maintained physical possession and control over the vessels, the work being done at its shipyards, and that the vessels were not turned over to the taxpayer until they had satisfactorily met Maritime tests and sea trials during which they were manned by the contractor’s crews. In finding that the taxpayer’s role in the construction of the vessels was “primarily a passive one,” the court, in
 
 Pacific Far East Line,
 
 513 F.2d at 1360, commented that “the contract assigned no role to the taxpayer apart from removal of the vessels from the shipyards after completion and formal delivery.”
 

 Right of Control
 

 With respect to the factor of right of control, HIRI relies on the statement of the Court of Claims in
 
 Lykes,
 
 513 F.2d at 1348, that the phrase “constructed ... by the taxpayer” requires “control over the details of the construction” and argues that such control was absent here because appellant did not prepare any working drawings and did not exercise any supervision over the workmen who built the refinery and the two offsite components. HIRI also asserts that it had a “turnkey contract” with Foster Wheeler to build a plant that worked as guaranteed, bringing it within the scope of
 
 Public Service Co. of New Mexico v. United States, supra
 
 note 6, in which the contractor followed the taxpayer’s specifications on results desired, but independently designed, engineered, constructed, tested, and turned over to the taxpayer a complete operational, electric generating plant.
 
 [7]
 
 However, we are persuaded that HIRI takes too narrow a view of “control over the details of the construction”; also, that its agreement with Foster Wheeler was
 
 not
 
 a turn-key contract.
 

 Regarding the latter, the contract with Foster Wheeler provided that, upon mechanical completion of the work but pri- or to mechanical acceptance by HIRI, Foster Wheeler would give written notice to HIRI, which would have ten days to give notice of any items requiring additional work,
 
 [8]
 
 and, upon completion, correction, or repair of such items, HIRI would give Foster Wheeler a letter of mechanical acceptance; thereafter, HIRI would exclusively
 
 *1068
 
 handle the start-up of the facility, and Foster Wheeler would complete all painting, thermal-insulation, and final clean-up; after notice that construction was complete, HIRI would give Foster Wheeler a certificate stating that the work was completed and accepted; finally, the contract provided that
 
 “HIRI shall at all times bear the risk of damage to, or loss of,
 
 ... all materials, equipment, tools, supplies and other items furnished by Foster Wheeler or by others for the Work, except construction tools and equipment owned or used by Foster Wheeler and ...
 
 all work completed or in progress, resulting from any cause whatsoever.’’
 
 (Emphasis added.) It is to be noted that the latter provision distinguishes this contract from a turn-key contract under which it is the
 
 contractor
 
 who assumes all risks up to the point of readiness for operation; further, that in
 
 New Mexico,
 
 it was the contractor — not the taxpayer — which handled the start-up, following which a “complete operational unit” was turned over to the taxpayer.
 

 Regarding “control over the details of the construction,” the contract provided that the Work was to be in accordance with nine exhibits and an appendix of five volumes of technical specifications, which were used by Foster Wheeler as a basis for preparing construction and shop drawings; that
 

 HIRI shall have the right, at any time and from time to time prior to mechanical acceptance of the Work, to request in writing alterations in, additions to and deletions from the Work, which are hereinafter referred to as “Changes”. Promptly upon each such request, Foster Wheeler shall prepare and submit to HIRI a detailed estimate of the net effect of a requested Change on the cost of the Work, on the Mechanical Acceptance date, and on the warranties and guarantees .... After Foster Wheeler and HIRI reach agreement with respect to the estimate, Lump Sum Price shall be adjusted accordingly and Foster Wheeler
 
 shall
 
 proceed with the Change. If agreement with respect to the estimate is not reached, HIRI shall have the right to
 
 require
 
 Foster Wheeler to make the Change .... [Emphasis added.]
 

 The contract further provided that HIRI could specify materials or services from suppliers, vendors or subcontractors, other than those selected by Foster Wheeler and that the price of the Work would be adjusted accordingly; that Foster Wheeler would procure all materials and services “as agent of HIRI”; that HIRI would be responsible, at such time as required by Foster Wheeler, for services in Foster Wheeler’s office of an engineer authorized by HIRI to approve designs and drawings, and for all permits, licenses, and similar documents required to be in HIRI’s name in connection with the Work and operation of the Plant. During construction, it should be noted, Messrs. Beebe and Quance visited the refinery worksite several times per week, focusing their inspection on workmanship, but also checking some of the equipment and apparatus to verify that it was being installed and erected in accordance with the contract plans and specifications. Also, the parties communicated with each other on an almost daily basis by mail, telex, or telephone, and as of January 1972 Foster Wheeler had sent to HIRI some 475 letters or telexes and HIRI had sent Foster Wheeler 305. The trial judge found that it was “not feasible to trace and identify all of those portions of the final designs, drawings, plans and specifications that were attributable to HIRI’s ideas, proposals, suggestions, recommendations, or instructions,” but concluded that “to a significant extent HIRI’s employees influenced and affected the content and makeup of the contract plans and specifications,” and that “the facility ... actually constructed was superior to and at a lower cost than that which would have been built had HIRI provided no input.”
 
 [9]
 

 
 *1069
 
 We are satisfied that the record sufficiently supports the trial judge’s conclusion that, for purposes of section 50(b), IRC, and regulation 1.50-1(c), the refinery was constructed, and not acquired, by HIRI.
 
 [10]
 
 Moreover, his conclusion is consistent with the clear understanding of Congress that, for purposes of both the investment tax credit and the analogous accelerated depreciation deduction, construction of the property need not be done by the taxpayer’s own employees, but can be pursuant to a contract with an independent contractor. H.R.Rep. No. 2087, 89th Cong., 2d Sess. 31 (1966); S.Rep. No. 1724, 89th Cong., 2d Sess. 3,16-17, 23-25 (1966), U.S.Code Cong. & Admin.News 1966, p. 4327; H.R.Rep. No. 413, 91st Cong., 1st Sess. 183-84 (1969); S.Rep. No. 552, 91st Cong., 1st Sess., 229-30 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645.
 

 Two Offsite Components Part of a Single Property
 

 An alternative argument made by HIRI is that the full cost of the two offsite components (tanker-mooring facility and refined products pipelines), considered separately from the refinery, qualified (whether acquired or constructed by HIRI) for the investment tax credit because construction work
 
 on them
 
 did not begin until May 21, 1971, and November 30, 1971, respectively, after the effective date of restoration of the investment tax credit, April 1, 1971. This approach would leave only the refinery (physical construction on it began, after the site leased by HIRI had been cleared, in January of 1971) subject to the limitation on the investment tax credit required by the Transitional Rule of section 50(b), IRC.
 
 [11]
 

 The trial judge, noting that nothing in the statutes or regulations deals specifically with what is a single property for purposes of section 50, IRC, reasoned that the tanker-mooring facility is used to transport raw materials to the refinery and the products pipelines connect the refinery with HIRI's storage facilities, so that the two offsite components, “in conjunction with the refinery itself, functionally form a single property,” construction of which began when construction was begun on the refinery component. We regard this as a reasonable approach, particularly since the refinery complex was conceived, designed, and constructed as a unit, the three components being placed in operation concurrently.
 
 [12]
 
 Thus, the investment tax credit is only allowable to HIRI with respect to that portion of the basis that is attributable to construction after August 15, 1971.
 

 In view of all the foregoing, the judgment of the United States Claims Court is
 
 affirmed.
 

 [13]
 

 AFFIRMED.
 

 [1]
 

 . Entered October 8, 1982, pursuant to this court’s order of October 4, 1982, and corresponding to the decision recommended by the trial judge in his opinion filed February 1, 1982.
 

 [2]
 

 . Total overpaid taxes were claimed in the amount of $963,749, but only $572,772 was available for 1974 because of limitations on use of investment tax credit carryovers in any one year; the remainder of $390,977 would have resulted from carryovers to later years. The total of $963,749 represents a credit of seven percent of $13,767,844, the cost basis of the refinery complex properly attributable to construction on or before August 15, 1971, which construction the Government contends was not eligible for said credit. The parties stipulated to the following cost bases attributable to construction on or before August 15, 1971:
 

 Marine Terminal $ 1,906,956
 

 Products Pipeline 538,251
 

 Refinery 11,322,637
 

 $13,767,844
 

 The cost bases upon which HIRI claimed an investment tax credit were:
 

 Marine Terminal $ 6,570,752
 

 Products Pipeline 2,084,201
 

 Refinery 23,145,634
 

 $31,800,587
 

 [3]
 

 . In section 48(b), IRC.
 

 [4]
 

 . A turn-key job is defined as “a job or contract in which the contractor agrees to complete the work of building and installation to the point of readiness for operation or occupancy.”
 
 Webster's Third New International Dictionary
 
 (1971 ed.). Up to that point, the contractor assumes all risks.
 
 Mobile Housing Environments v. Barton and Barton,
 
 432 F.Supp. 1343, 1346 (D.Colo.1977);
 
 Glassman Const. Co. v. Maryland City Plaza, Inc.,
 
 371 F.Supp. 1154, 1157 (D.Md.1974),
 
 aff'd mem.,
 
 530 F.2d 968 (4th Cir.1975).
 

 [5]
 

 . See this court’s opinion in
 
 South Corporation v. United States,
 
 690 F.2d 1368, 215 USPQ 657 (Fed.Cir.1982).
 

 [6]
 

 . In
 
 Public Service Co. of New Mexico v. United States,
 
 431 F.2d 980, 983 (10th Cir.1970), strongly relied upon by appellant, which involved construction of a 66,000 kilowatt electric generating plant, the court remarked: “Right of control is the touchstone in this suit.” It rejected the idea that “control and supervision which every owner has the right to exercise over the general work” meets this test. It also said, in dictum, that the purpose of the phrase “in accordance with his specifications” in the regulation was “to distinguish between work done by independent contractors and mere employees.” However, the Court of Claims in
 
 Lykes,
 
 513 F.2d at 1351, made clear that it did not wish to go that far and, indeed, HIRI states that “it does not consider mere construction by an independent contractor, without more, to be conclusive that property was acquired by the taxpayer.”
 

 [7]
 

 . Indeed, the Tenth Circuit said: “There does not appear in the record any direct testimony that Public Service [the taxpayer] ... did anything more than specify the technical data and performance expectations sought from the completed installation,” and it observed that while Public Service did have an employee on the job site nearly every day, “the job of this man was only that of an inspector who in fact acted much like a liaison man between the contracting parties”; further, that the contractor’s construction superintendent “had complete control over the entire project.” (431 F.2d at 983-84.) Such a passive role played by the taxpayer in that case and in
 
 Lykes
 
 and
 
 Pacific Far East Line
 
 is a far cry from the active control exercised by HIRI in this case, as developed
 
 infra.
 

 [8]
 

 . HIRI furnished a list of approximately 50 items requiring repair before acceptance.
 

 [9]
 

 . Prior to execution of the contract, Foster Wheeler submitted to HIRI for its approval a design for the refinery together with an estimate of cost. HIRI rejected the estimate, which was higher than the amount budgeted, and Quance was directed to work with Foster Wheeler to devise a “reduction-in-scope program” to effect a cost savings of five to ten
 
 *1069
 
 percent. The result was modification of five to ten percent (in dollar value) of the Foster Wheeler design.
 

 [10]
 

 . We are also satisfied that the record sufficiently supports the trial judge’s conclusion that the two offsite components of the refinery complex were constructed, and not acquired, by HIRI.
 

 [11]
 

 .
 
 See supra
 
 note 2, which shows the impact of the Transitional Rule when the two offsite components and the refinery are treated as a single property.
 

 [12]
 

 . The Government argues that if the tanker-mooring facility and the refined products pipelines are considered separate projects, and, thus, “separate properties” for purposes of section 50, they would not qualify as “section 38 property” under section 48(a)(1)(B), IRC. However, we need not address the merits of this argument in view of our disposition of this case.
 

 [13]
 

 . HIRI argues that the trial judge’s interpretation of the applicable law is improperly restrictive contrary to the Court of Claims’ “dedication to liberal construction of the investment credit law.” HIRI’s position appears to be that, even though the incentive to business that motivated Congress to restore the investment tax credit was not a factor in construction of the refinery complex, a “liberal” approach compels this court, in construing the Transitional Rule of Section 50, IRC, to ignore the clear intent of Congress not to allow tax credits on construction prior to the effective date of the law. We believe the Congressional intent is highly relevant and note, particularly, the statement in S.Rep. No. 437, 92d Cong., 1st Sess. 8 (1971), U.S.Code Cong. & Admin.News 1971, p. 1924, quoted earlier in this opinion, that “the credit is extended to property ordered
 
 on and after
 
 April 1, 1971.” (Emphasis added.)