SEALY POWER, LTD., DONALD E. RUTT, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sealy Power, Ltd. v. Commissioner
Docket No. 13568-88
United States Tax Court
T.C. Memo 1992-168; 1992 Tax Ct. Memo LEXIS 179; 63 T.C.M. (CCH) 2482; March 23, 1992, Filed *179 Decision will be entered under Rule 155. S owned and operated a facility that converted solid waste into electricity by burning the waste and generating electricity from the heat. The incinerator at S's facility never worked properly, thereby preventing the facility from generating consistent quantities of electricity. Held, the notice of final partnership administrative adjustment was not arbitrary. Held, further, whether an individual partner is at risk pursuant to sec. 465, I.R.C., is an "affected item" which is not an item over which the Court has jurisdiction in a partnership level proceeding. Dial USA, Inc. v. Commissioner, 95 T.C. 1 (1990). Held, further, the facility was not placed in service within the meaning of sec. 1.46-3(d), Income Tax Regs., in 1983 or 1984. Ruth E. Salek and George W. Connelly, Jr., for petitioner. T. Richard Sealy, III, for respondent. NIMS
NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent proposed adjustments to partnership items of Sealy Power, Ltd. (the partnership), pursuant to the partnership audit and litigation procedures of sections 6221-6233 with respect to *180 taxable years 1983 and 1984. The proposed adjustments are as follows: 1983
Taxes
$ 58,792
Depreciation
41,411
General partner's fee
157,500
Accounting fees
1,250
Bug spray
900
Dow therm
27,640
Legal fees
20,000
Management fees
100,000
Power lines
83,900
Investment tax credit (basis)
3,261,837
Business energy tax credit
2,248,457
Net earnings from self empl.
136,813
Accelerated depreciation (tax
preference item)
1,709
Net investment income
338,024
1984
Depreciation
$ 707,586
Legal fees
10,000
Interest expense
98,625
Bank charges
97
Insurance expense
233
Check printing and deposit expense
115
Amortization expense
2,502
Net earnings from self empl.
236,877
Accelerated depreciation
20,508
Qualified investment expenses
367,021
(tax preference item)
After concessions, the issues for decision are: (1) Whether the notice of final partnership administrative adjustment was arbitrary so as to shift the burden of going forward with the evidence to respondent; (2) whether the partners of the partnership were at risk within the meaning of section 465 so as to be entitled to the claimed deductions and credits; and (3) whether for purposes of depreciation *181 and investment and energy tax credits the property of the partnership's facility was placed in service in 1983, 1984, or some other year. Unless otherwise indicated, all section references are to the Internal Revenue Code for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. On March 30, 1988, respondent issued the notice of final partnership administrative adjustment (FPAA) in this case. Donald E. Rutt (petitioner), as the tax matters partner, filed a petition for readjustment of partnership items. Rutt resided in Kingwood, Texas, at the time he filed the petition. The partnership is a Texas limited partnership. It filed its Certificate of Limited Partnership on October 21, 1983. The partnership's stated purpose was to build and operate a power production facility (facility) in Sealy, Texas, which was to produce, from solid waste, 38,400 kilowatt hours per day of electricity to be sold to Houston Lighting and Power Co. (HLP). During 1983 and 1984, the partnership *182 had two general partners (Donald E. Rutt and Jim R. Connatser), three new limited partners, and 39 limited partners. The partnership was adequately capitalized, with the partners contributing substantial amounts of cash, promissory notes, and letters of credit. The total initial cash contribution to the partnership by the limited partners was $ 392,000, and each limited partner pledged a letter of credit that was used to obtain a $ 790,500 loan from Texas Investment Bank. Each limited partner paid his or her share of the $ 790,500 partnership loan from Texas Investment Bank. Energy Advancement, Inc. (EAI), built the facility on behalf of the partnership on property located next to the City of Sealy's landfill. The lease agreement between the partnership and the City of Sealy required the partnership to operate the landfill. Tor Lileng, an engineer employed by EAI, designed and supervised construction of the personal property, related buildings, and foundations at the facility. Lileng's design for the facility provided for acquiring various units of machinery from different manufacturers, placing them on concrete slabs and connecting them with wires and pipes. The facility *183 consisted of the following property: a. A building where garbage was deposited by trucks and housed; b. a hopper with a screw/auger feeder, attached to the building. Garbage in the building was loaded into the hopper, and the feeder would move the garbage into the incinerator; c. an incinerator where the garbage was to be burned in two stages; and d. various equipment designed to recover the heat generated by burning the garbage and turn it into electricity, such as a vaporizer, steam superheater, separator, expander, and steam turbines.
A large building was constructed at the facility. In this building trash was accepted, sorted, and dried so that it could be burned by the incinerator. A tractor was used in this part of the facility to move and sort the garbage. The building also contained a conveyor which moved the dried garbage to the incinerator. The incinerator was located on its own slab in a pit next to, but separate from, the building. The incinerator had two chambers. In the first chamber the garbage was heated without air so it would be gasified. The second chamber burned the gasses that were generated in the first chamber. The heat produced *184 by the incineration process turned two separate turbine systems, one steam and one dowtherm, to generate electricity. The facility, which cost approximately $ 3,500,000 to construct, functionally formed a single property. The purpose of the facility was to generate electricity from solid waste. On June 6, 1984, EAI entered into an agreement with HLP on behalf of the partnership which provided for the sale of the electricity produced by the facility to HLP at a price equal to the costs which HLP avoided by not having to produce the power itself. From the winter of 1983 through a portion of 1988, the partnership operated the landfill adjacent to the facility. In so doing, it employed two gatekeepers and paid for required bulldozing. The ground lease between the City of Sealy and the partnership provided that the City of Sealy and its residents could dispose of their garbage at the landfill free of charge. Commercial establishments located within the Sealy city limits could dispose of an incidental amount of garbage at the landfill free of charge, but they had to pay a "tipping fee" equal to the current commercial rate for garbage disposal if they wished to dispose of more than *185 an incidental amount. The partnership was not to be compensated for operating the landfill unless the cost of operation exceeded $ 60,000. The partnership would be reimbursed for any costs incurred over $ 60,000. The partnership reported the following tipping fees from persons depositing garbage at the landfill: 1984
$ 5,471
1985
-0- 1986
11,200
1987
9,664
The partnership first operated the incinerator at the facility on or before December 31, 1983. The facility functioned sporadically for a short period of time. A number of problems kept the facility from becoming operational: The feed mechanism continually jammed with different types of garbage, such as plastic bags and telephone books. There were problems with the ash conveyor, which was supposed to convey ashes from the incinerator to a dump truck for deposit in the landfill. The facility's most critical problem was with the incinerator. Although its manufacturer claimed the incinerator would generate 20 million BTUs per hour, it never consistently generated heat at its rated capacity. These problems prevented the facility from generating commercial quantities of electricity. According to HLP's records, *186 the facility generated the following amounts of electricity into the HLP system: January 1985
80 kilowatt hours
February 1986
30 kilowatt hours
March 1986
88 kilowatt hours
This production entitled the partnership to a credit against its customer charges in the amount of $ 5.34. The facility was disconnected from the HLP system on April 1, 1986. By early 1985, it was evident that the facility could not become operational with its then-existing equipment and that more money would be required to make it operational. About this time, Rutt and Connatser began contacting potential investors for this purpose. They were not successful, and the partnership eventually filed for bankruptcy on July 1, 1988. The property of the facility is tangible personal property within the meaning of section 48(a)(1)(A). The assets of the facility are section 38 property and would otherwise be eligible for depreciation, investment tax credit, and biomass energy credit in a year during which the assets were placed in service. OPINION The partnership took an investment tax credit and a biomass energy tax credit in 1983 and depreciation deductions in 1983 and 1984 with respect to nearly all *187 of its property. Respondent disallowed the deductions and credits. After concessions, the issues for decision are: (1) Whether the FPAA is arbitrary so as to shift the burden of going forward with evidence to respondent; (2) whether the partners had a sufficient amount at risk within the meaning of section 465; and (3) whether the facility was placed in service in 1983, 1984, or some other year. Arbitrary
Petitioner alleges that the FPAA in this case was nothing more than a boiler-plate notice, determining adjustments that had no basis in fact. Petitioner argues that the FPAA is merely a naked assessment and should be held to be arbitrary so as to shift the burden of going forward to respondent. It is well settled that respondent's determinations, as embodied in the notices of deficiency, are generally presumed correct. Welch v. Helvering, 290 U.S. 111, 115 (1933). We have recognized the similarity between FPAAs and notices of deficiency: both are notifications of respondent's final administrative determination and are prerequisites to the initiation of a proceeding in this Court. Clovis I v. Commissioner, 88 T.C. 980, 982 (1987). *188 The partnership adjustments in the case before us did not result from a determination by respondent that the partnership had unreported illegal income which was based upon no substantive evidence. See Jackson v. Commissioner, 73 T.C. 394, 401 (1979). Rather, the adjustments resulted from respondent's determination, among others, that the partnership had failed to substantiate that it was entitled to the claimed deductions and credits and that the indebtedness owed to the partnership was real. Consequently, petitioner continues to bear the burden of going forward with the evidence. Rule 142(a). At Risk
Petitioner introduced a substantial amount of evidence and devoted a great deal of time and space in his briefs on the issue of whether the partners of the partnership were sufficiently at risk so as to be entitled to the claimed deductions and credits. Determinations with respect to partnership assets, investments, transactions, and operations that are necessary to enable the partnership or the partners to determine amounts at risk in any activity are made at the partnership level. Sec. 301.6231(a)(3)-1(a)(1)(vi), Proced. & Admin. Regs. However, whether *189 an individual partner is at risk pursuant to section 465 so as to be able to properly take deductions and credits is an "affected item". Dial USA, Inc. v. Commissioner, 95 T.C. 1, 5 n.5 (1990); Roberts v. Commissioner, 94 T.C. 853, 858-861 (1990); sec. 301.6231(a)(5)-1T(c), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790 (Mar. 5, 1987). This Court does not have jurisdiction over affected items in a partnership level proceeding. N.C.F. Energy Partners v. Commissioner, 89 T.C. 741 (1987). Therefore, we do not have jurisdiction over and do not decide whether the partners were at risk in this case. Placed in Service
The partnership took depreciation deductions in 1983 and 1984 and a biomass energy tax credit and an investment tax credit for the facility in 1983. The partnership is entitled to a depreciation deduction beginning in the year an asset eligible for depreciation is placed in service. Sec. 167. Likewise, the partnership is entitled to an investment tax credit and a biomass energy credit for certain section 38 property in the year such property is placed in service. Sec. 46. The parties *190 have agreed that the partnership is entitled to the deductions and credits taken in the year the property is placed in service. Thus, we must determine in which year, if any, those assets were placed in service. Petitioner argues that all of the assets of the facility were placed in a state of readiness by the end of 1983. In the alternative, petitioner argues that the assets were placed in service in 1984, at which time, petitioner asserts, the facility first became operational. Respondent, on the other hand, argues that the assets were not placed in service in 1983 or 1984 because the facility never produced a consistent amount of electricity. Section 1.46-3(d)(1), Income Tax Regs., provides: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade *191 or business, in the production of income, in a tax-exempt activity, or in a personal activity.
We applied the above placed-in-service regulations in Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987). In that case, the taxpayer began construction of a hydroelectric power plant in 1969. In September 1972, the taxpayer received final approval from the Federal Power Commission to begin regular operation of the plant, subject to the successful completion of preoperational testing on part of the plant (unit 1). In October 1972, as part of preoperational testing, unit 1 began pumping water from Lake Michigan into the upper reservoir. In November 1972, the generation mode of unit 1 was placed on line. From November 18, 1972, through December 5, 1972, unit 1 generated 4,580 megawatt hours of electrical power, substantially all of which was sold to the taxpayer's customers. On December 7, 1972, unit 1 temporarily shut down for repairs. Preoperational testing resumed on January 9, 1973, and was completed on January 17, 1973. The taxpayer formally accepted unit 1 on that date. We rejected the taxpayer's contention that unit 1 was placed in service in 1972 *192 because it actually pumped water and generated electrical power as of that date, and we stated: Although unit 1 pumped water into the reservoir and generated electrical power during preoperational testing in 1972, unit 1 was not available in 1972 to provide electrical power on a regular basis in 1972. The amount of electrical power generated in 1972 is insufficient to establish that the * * * [power plant] was available for full operation on a regular basis in 1972. * * * Not until January 17, 1973, after unit 1 successfully had completed all phases of preoperational testing, thereby demonstrating that it was available for service on a regular basis, was the unit in a state of readiness and availability for its specifically assigned function within the meaning of sections 1.46-3(d)(1)(ii) and 1.167(a)-11(e)(1)(i), Income Tax Regs. [Consumers Power Co. v. Commissioner, supra at 724; emphasis added.]
Thus, the placed-in-service test requires that before property can be considered placed in a condition or state of readiness and availability for a specifically assigned function, it must be available for service on a regular basis. In the instant *193 case, the problems encountered with the incinerator prevented the facility from generating electricity on a regular basis. While the regulations do not require that the facility be free of all flaws and defects, the facility must ultimately operate in fulfillment of its specifically assigned function. See Noell v. Commissioner, 66 T.C. 718, 728-729 (1976). The facility was designed to generate 38,400 kilowatt hours of electricity per day. HLP records indicate that the facility generated a total of 198 kilowatt hours of electricity while it was operational. Given these facts, it cannot be said that the facility was operating on a regular basis. Petitioner argues that even though we may find that the entire facility was not functioning properly and thus could not be considered placed in service as a whole, we should find that each part of the facility was placed in service when it was in a state of readiness for its assigned function regardless of whether the other items of the facility were operational. In Consumers Power Co. v. Commissioner, supra at 726, we held that the hydroelectric plant at issue "must be viewed as one integrated *194 unit because the physical plant and the reservoir operate simultaneously and as a unit in order to produce electrical power." Our holding was based in part on Hawaiian Independent Refinery, Inc. v. United States, 697 F.2d 1063 (Fed. Cir. 1983), in which the Court of Appeals for the Federal Circuit concluded that the "component assets" of an oil refinery complex "'functionally [formed] a single property' and held that the entire refinery complex was to be treated as a single asset for purposes of the investment credit." Consumers Power Co. v. Commissioner, supra at 726. We likewise conclude that in the instant case the component assets of the facility functionally formed a single property. Only after the facility was complete and working on regular basis could the assets be considered to be placed in service. Thus, in order for any part of the facility to be considered placed in service, the entire facility must be functioning for its intended purpose of generating electricity. We have found as a fact that the purpose of the facility was to generate electricity by burning solid waste. The electricity generated was to be sold to HLP. *195 Until the facility was connected to HLP and selling electricity, the facility could not fulfill its intended purpose. It never did generate or sell electricity on a regular basis, and it cannot therefore be considered to have been placed in service in the years at issue. The partnership did not finalize the agreement to sell electricity with HLP until June 6, 1984. The records of HLP reflect that the facility did not generate saleable amounts of electricity until 1985, and even then the amounts were negligible. Petitioner contends that the records of HLP are off by a year and that the facility actually began generating electricity in 1984. We find no evidence to support petitioner's contention, and even if there were, since the facility never generated more than an incidental amount of electricity, such evidence would not make a difference. The facility never generated electricity on a regular basis during 1983 or 1984, and we therefore hold that if the facility was placed in service at all, it was not done until after the years at issue. Petitioner next argues that the facility's purpose was to be a waste disposal facility, not to generate electricity. However, the partnership *196 consistently represented itself as a power-producing facility. For example, its Certificate of Limited Partnership states that the partnership's purpose includes "the construction, management and operation of a production facility * * * which will convert solid waste into electricity that will be sold to * * * [HLP]." The partnership did not receive a fee for operating the landfill and only received modest tipping fees. Without the money received from the anticipated sale of electricity, the partnership could in no way justify the multimillion dollar cost of the facility. We think that the only plausible purpose for the partnership and the facility, if they are considered to be operated for profit, is as a producer of electricity. Next, petitioner relies on Sears Oil Co. v. Commissioner, 359 F.2d 191 (2d Cir. 1966), revg. on this issue T.C. Memo. 1965-39; and SMC Corp. v. United States, 46 AFTR 2d 80-5827, 80-2 USTC par. 9642 (E.D. Tenn. 1980), affd. per curiam 675 F.2d 113 (6th Cir 1982), in an effort to show that the facility was placed in service in 1983. Petitioner argues that the assets of *197 the facility were placed in a condition of readiness and that it was only the incinerator's failure to function, a problem outside the control of the partnership, that prevented the facility from being fully operational. In Sears Oil Co., the taxpayer acquired a barge used to transport petroleum products. The taxpayer was prevented from actually using the barge in the year in which it was acquired because the barge was frozen in a canal in upstate New York. The Court of Appeals for the Second Circuit reversed this Court's holding that the barge was not placed in service until actually used. In so holding the Second Circuit stated that the barge was placed in service in the earlier year, but was not actually used because the use was prevented by a factor beyond the control of the taxpayer. Sears Oil Co. v. Commissioner, supra at 198. Petitioner asserts that the instant case is similar to Sears Oil Co. in that all of the assets in the facility were operational and that it was only the incinerator's failure to consistently operate at capacity, a circumstance beyond the partnership's control, that caused the facility to fail to generate power on a *198 regular basis. Petitioner therefore argues that the assets were available for use, but such use was prevented by a factor outside the partnership's control. We disagree. In Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739 (1985), affd. 803 F.2d 1572 (11th Cir. 1986), we reviewed several cases, including Sears Oil Co. v. Commissioner, supra, and SMC Corp. v. United States, supra, in which the placed-in-service requirement was met for assets not yet in actual use but available or in a state of readiness for use in an operating trade or business. We identified two factors significant to the result in these so-called idle asset cases: (1) The taxpayers were already engaged in the business for which the equipment had been purchased; and (2) the taxpayers had done all that was in their power to place the equipment into service. We find that petitioner has failed to satisfy both requirements. First, petitioner has failed to show that the partnership was already engaged in the production of electricity from solid waste prior to constructing the facility. The partnership was formed *199 to construct and operate the facility, and the facility was the first power plant of the partnership. The partnership did not have several other plants at the Sealy landfill generating power, to which the partnership could add this facility. Thus, petitioner was not already engaged in the business for which the equipment had been purchased. Second, petitioner has failed to show that the partnership had done all that was in its power to place the facility into service. In Sears Oil Co. v. Commissioner, supra, for example, the taxpayer was prevented from placing the asset in service by an act of God; i.e., the freezing of the canal. Here, while it is true that the incinerator failed to function up to the manufacturer's specifications, this does not mean that the problem with the facility was out of the control of the partnership. Petitioner has not shown that the problems with the incinerator were insurmountable or that the incinerator was not financially feasible to repair. Merely because the facility did not work does not mean that it could not work. Thus, we find that petitioner has failed to show that the circumstances preventing the use of the facility *200 were out of the control of the partnership, and he may therefore not rely on Sears Oil Co. or SMC Corp. to support his position. Petitioner's next argument alleges that the facility was placed in service in 1984 because it satisfied the requirements articulated in Oglethorpe Power Corp. v. Commissioner, T.C. Memo. 1990-505. In that case, we noted five factors which the Internal Revenue Service considers in determining in what year an electric generating unit is placed in service: (1) Whether the necessary permits and licenses for operation have been obtained; (2) whether critical tests necessary for proper operation have been performed; (3) whether the taxpayer has control of the facility; (4) whether the unit has been synchronized with the transmission grid; and (5) whether daily operation has begun. Petitioner argues that the facility has met each of the above criteria and should therefore be considered placed in service in 1984. However, we need not decide whether the facility satisfied each of the above requirements sufficiently to cause the facility to be deemed to have been placed in service in either of the years before us. In Oglethorpe Power *201 Corp., while quoting the above factors, we did not decide the placed-in-service issue based on the factors. Instead, we relied on Consumers Power Co. and Piggly Wiggly to hold that property is placed in service in the year regular operation begins, stating: Not until the operational defects discovered during post-synchronization testing had been corrected and the unit had demonstrated its ability to sustain power generation near its rated capacity was * * * [the unit] available for the specific function for which it had been designed and constructed. * * * [Emphasis added.]
In the instant case, to use the words of Oglethorpe Power Corp., the facility did not demonstrate "its ability to sustain power generation near its rated capacity". In fact, the facility never generated power at its rated capacity for even a single day. Thus, petitioner has failed to show that the facility was "available for the specific function for which it had been designed and constructed", and Oglethorpe Power Corp. does not support petitioner's position. Finally, petitioner asserts that there are not one but two placed-in-service requirements, one for tangible personal *202 property and another for other tangible property which is an integral part of the production of electricity. According to petitioner, assets that are "other tangible property" under section 48(a)(1)(B) must actually be used on a regular basis as articulated in Consumers Power Co. and Oglethorpe Power Corp. because section 48 also requires that such assets be an integral part of manufacturing or production. See sec. 48(a)(1)(B). However, since section 48(a)(1)(A) does not require that tangible personal property be an integral part of manufacturing or production, such property, according to petitioner, is placed in service the moment it is available for the taxpayer to use, even though it cannot factually be used because of other factors not related to the tangible personal property itself. Since the property of the facility was tangible personal property, petitioner contends the property was placed in service in 1983 when it became available for use. Petitioner acknowledges that the cases he cites do not make any distinction between "other tangible property" and "tangible personal property". The cases petitioner discusses in his brief do not limit the placed-in-service *203 requirements to other tangible property which is an integral part of production, nor could they, given the statutory framework. Section 48, to which petitioner refers, provides the definition of section 38 property. The time at which section 38 property is considered placed in service is governed by the regulations under section 46. We find nothing within the definition of section 38 property or the placed-in-service test which would warrant disparate treatment depending on the type of property, and we therefore consider petitioner's argument to be without merit. To reflect the foregoing and concessions, Decision will be entered under Rule 155.