SISKIYOU COMMUNICATIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siskiyou Communications, Inc. v. Commissioner
Docket No. 29264-88
United States Tax Court
T.C. Memo 1990-429; 1990 Tax Ct. Memo LEXIS 446; 60 T.C.M. (CCH) 475; T.C.M. (RIA) 90429; August 8, 1990, Filed *446 Decision will be entered for the respondent. Alan J. Vogl, for the petitioner. Debra Bowe, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION
*447 In his notice of deficiency, respondent determined a deficiency of $ 219,471 for tax year 1984. The only issue to be decided is whether telephone switching equipment was placed in service in 1984, enabling petitioner to claim investment tax credit and depreciation in that year. Most of the facts have been stipulated by the parties and are so found. The stipulation of facts and exhibits attached are incorporated by this reference. For convenience, our Findings of Fact and Opinion are combined. Siskiyou Communications, Inc., petitioner, had its principal place of business in Fort Jones, California, at the time it filed the petition in this case. Petitioner filed a consolidated return in 1984 with its two subsidiaries, Siskiyou Telephone Company (Telephone Company) and Siskiyou Cablevision, Inc.
During 1983, the Telephone Company contracted with Northern Telecom,Inc., for the installation of two DMS-10 units, one for its Etna, California, office and one for its main office in Fort Jones, California. [1] The DMS-10 is a state-of-the-art digital telephone switching system which the petitioner desired to replace its existing Stromberg electromagnetic switch. The function of the *448 DMS-10 is to channel telephone calls to the correct connections so that the calls can be completed, to provide operator services to telephone customers, and to provide accounting information necessary to bill telephone calls and services. Customer lines could not be connected to both the old Stromberg switch and the new DMS-10 switch at the same time. The cost of the DMS-10 for the Fort Jones office was $ 1,333,943. The Telephone Company also acquired new toll carriers in 1984 that were needed to enable the DMS-10 equipment at the Fort Jones office to process calls. The toll carriers enable a number of calls to be transmitted on microwave channels. The cost of the toll carriers for the Fort Jones office was $ 68,428. The parties stipulated that the DMS-10 system and the toll carriers are depreciable 5-year property. Northern Telecom started installation *449 of the DMS-10 equipment and toll carriers at the Fort Jones office on September 1, 1984, and completed the job on or about October 26, 1984. At this point, title and possession of the DMS-10 equipment and toll carriers at the Fort Jones office passed to the Telephone Company. When the DMS-10 equipment was turned over to the Telephone Company by Northern Telecom in November 1984, it was fully capable of performing its designed functions; however, the Telephone Company needed to perform additional functions, including wiring for outside cutover, before the equipment could be used to process customer calls on a regular basis. The Telephone Company subsequently prepared for customer cutover to the DMS-10 system on November 1, 1984. The wiring for outside cutover took several days to a week and entailed laying down approximately 1200 jumpers from the outside cable pairs to the DMS-10 clocks mounted on the mainframe in the central office. Wiring for outside customer cutover took place during the period January 1, 1985, to January 21, 1985. In order to avoid adverse publicity and customer complaints for poor service and billing errors when the change was made from the old switching *450 system to the DMS-10 system, the Telephone Company decided against switching until such time that its employees were thoroughly trained on the DMS-10 equipment. Training of Telephone Company personnel took place in November and December of 1984, as well as in January 1985. During this period test calls were made on the DMS-10 equipment to train operators on the new system. During this period, toll test tapes were sent to data processing to verify the accuracy of the billing information produced by the DMS-10 equipment. The Telephone Company tested a customer's line by removing it from the Stromberg switch and attaching it to the DMS-10 switch. After testing the customer's line for a day or two, the customer's line would then be reconnected to the Stromberg switch. Less than a dozen customers had their lines spliced from connection with the Stromberg switch and connected to the DMS-10 switch for testing purposes. On January 21, 1985, the Telephone Company cut over from the old Stromberg switch to the new DMS-10 switch and toll carriers at the Fort Jones office. The actual cutover from the Stromberg switch to the DMS-10 switch required technicians to pull out the line circuit plates, *451 inserting the plugs in the back of the DMS-10 and transferring the circuit. The DMS-10 and toll carriers were first available for regular use to handle customer calls on January 21, 1985. The cutover date chosen by the Telephone Company was picked for business reasons, in that the Telephone Company needed to prepare wires for cutover, train its operators, and avoid customer service disruption. In his notice of deficiency, respondent disallowed $ 210,355 in depreciation and $ 112,190 in investment tax credit on the theory that the switch and the toll carriers were not placed in service in 1984, the year in which petitioner claimed they were placed in service. Section 167(a)[2] states: There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income. *452 In the case of recovery property (within the meaning of section 168), the deduction allowable under section 168 shall be deemed to constitute the reasonable allowance provided by this section, except with respect to that portion of the basis of such property to which subsection (k) applies.
In addition, the "period for depreciation of an asset shall begin when the asset is placed in service." Sec. 1.167(a)-10(b), Income Tax Regs.Section 1.167(a)-11(e)(1)(i), Income Tax Regs., states that: Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function * * *. In general the provisions of paragraph (d)(1)(ii) and (d)(2) of section 1.46-3 shall apply for the purpose of determining the date on which property is placed in service * * *.
Section 1.46-3(d), Income Tax Regs., provides, in relevant portion: (1) For purposes of the *453 credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function * * *. (2) In the case of property acquired by a taxpayer for use in his trade or business (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function: (i) Parts are acquired and set aside during the taxable year for use as replacements for a particular machine (or machines) in order to avoid operational time loss. (ii) Operational farm equipment is acquired during the taxable year and it is not practicable to use such equipment for its specifically assigned function in the taxpayer's business of farming until the following year. (iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing *454 to eliminate any defects.
Petitioner argues that the DMS-10 was placed in service in 1984 because it was in a state of operational readiness during that year, even though it was not in use. Petitioner also cites section 1.46-3(d)(2)(ii), Income Tax Regs., for the proposition that equipment is placed in service when its use is practicable, not whether the taxpayer did everything within his control to put the property into play. In support of this argument, petitioner cites Sears Oil Co. v. Commissioner, 359 F.2d 191 (2d Cir. 1966), SMC Corp. v. United States, an unreported case ( E.D. Tenn. 1980, 46 AFTR2d 80-5827, 80-2 USTC par. 9642), affd. per curiam 675 F.2d 113 (6th Cir. 1982), and Schrader v. Commissioner, T.C. Memo. 1975-364, affd. 582 F.2d 1374 (6th Cir. 1978), in which the assets were held to have been placed in service during the taxable year because they were ready and available to perform their specifically assigned functions, even though the taxpayers were precluded from using the assets during the taxable year due to circumstances beyond their *455 control. Petitioner's reliance on the above line of cases implies that the Telephone Company was precluded from using the equipment due to circumstances beyond its control. There is nothing in the record suggesting that petitioner was prevented from employing the DMS-10 system and toll carriers in 1984 due to the intervention of some outside circumstance, such as a barge which froze in a river before it could carry out its first assignment, Sears Oil CCo. v. Commissioner, supra, or a metal shredder that could not be operated in the year it was purchased only because the utility company failed to complete a power line to it prior to year's end, SMC Corp. v. United States, supra. Instead, petitioner had full control over the new switching device and toll carriers with no outside interference delaying its introduction until 1985. Therefore, petitioner's argument that it should be accorded the same treatment as the disadvantaged taxpayers in the above line of cases is meritless. We next address petitioner's argument that it was not practical to use the DMS-10 and the toll carriers for their specifically designed function until 1985, but that it should be considered *456 as placed in service in 1984. Petitioner contends that it was not practical to switch over to the new switching equipment in 1984 because the Telephone Company desired to properly train their employees to operate the new system. The training was designed to avoid adverse customer reaction to the introduction of the new system and to ensure that the employees knew how to run the new switching technology. We think petitioner stretches the word "practical" to describe its decision to start up the DMS-10 and toll carriers in 1985. We are convinced that, given the time necessary to train the employees and prepare for the new technology, it was not possible for petitioner to introduce the DMS-10 until January 21, 1985. Although the DMS-10 and toll carriers were independently functional in November 1984, they were but a piece in the total provision of telephone services to petitioner's customers. If Telephone Company's employees did not know how to operate the new equipment, it was useless until they learned to operate it. Whether it was practicable for the Telephone Company to bring the new switching system to life in 1985 implies that it had the discretion to wait, even though the *457 system was operational. Furthermore, extensive wiring activities related to disconnecting wires from the Stromberg switch and reconnecting them to the DMS-10 had to be completed before the new switch could be utilized. Therefore, it was not possible to use the DMS-10 switch and the toll carriers in 1984. Sec. 1.46-3(d)(2)(ii), Income Tax Regs.
Finally, we note that petitioners did not utilize the remainder of 1984 in which to test the new switch in order to eliminate defects. Testing on the equipment was undertaken in October 1984, and was completed by November of that same year. We find that the example provided in section 1.46-3(d)(2)(iii) does not give petitioner any relief. Respondent cites Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), in which this Court dealt with the issue of when a hydroelectric plant was placed in service. Construction of the plant began in 1969. In September 1972, the taxpayer received final approval from the Federal Power Commission to fill the upper reservoir and to begin regular operation of the plant, subject to the successful completion of preoperational testing of unit 1. In October 1972, *458 as part of preoperational testing, unit 1 began pumping water. During the period from October 23, 1972, through December 7, 1972, unit 1 pumped water. On November 18, 1972, the generating mode of unit 1 was placed on line and from November 18, 1972, through December 5, 1972, still as part of the preoperational testing, unit 1 generated electrical power, substantially all of which was sold to the taxpayer's customers. By December 7, 1972, many of the preoperational tests had been completed, but a number of tests still remained. On December 7, 1972, in conjunction with one of the final preoperational tests, electrical power to unit 1 was temporarily disrupted, and due to a mechanical failure, damage occurred. Unit 1 was shut down until January 9, 1973, for repairs. On January 9, the repairs were completed and preoperational testing was resumed. On January 17, 1973, testing of unit 1 was completed and unit 1 was formally accepted from the general contractor. On January 18, 1973, electrical power from unit 1 was available for transmission into the utility companies' pool. In determining when unit 1 was in a state of readiness and availability for its specifically assigned function *459 within the meaning of section 1.46-3(d)(1)(ii), the Court reasoned: Although unit 1 pumped water into the reservoir and generated electrical power during preoperational testing in 1972, unit 1 was not available in 1972 to provide electrical power on a regular basis in 1972. * * * The generation of electrical power and the pumping of water into the upper reservoir were both necessary parts of preoperational testing. * * * [Consumers Power Co. v. Commissioner, 89 T.C. at 724.]
The taxpayers in Consumers Power Co. argued that even if the plant were found not to have been placed in service in 1972, a component part, the reservoir, was available for use in 1972 and thus depreciation and investment credit would be allowable with respect to the costs of the component part. The Court noted that neither the statute nor the regulations specifically address what is to be regarded as a single property for purposes of depreciation and the investment credit. Relying on Public Service Co. of N.M. v. United States, 431 F.2d 980 (10th Cir. 1970), and Hawaiian Independent Refinery, Inc. v. United States, 697 F.2d 1063 (Fed. Cir. 1983), *460 the Court held that the plant "must be viewed as one integrated unit because the physical plant and the reservoir operate simultaneously and as a unit in order to produce electrical power." Consumers Power Co. v. Commissioner, 89 T.C. at 726. We agree with respondent that the DMS-10 switch and toll carriers were but parts of an integrated operation carried on by the Telephone Company. In that sense, they are analogous to unit 1 in the Consumers Power Co. case. The DMS-10 switch and the toll carriers could not perform their specifically assigned functions unless connected to the Telephone Company's customer lines. This equipment was not placed in a condition or state of readiness and availability for its specifically assigned function until the entire system was connected on January 21, 1985. For the above reasons, we hold that the DMS-10 switch and the toll carriers that were placed at the Fort Jones office were not placed in service until January 21, 1985. Decision will be entered for the respondent.
Footnotes
1. Whether depreciation and the investment tax credit are allowable with regard to the equipment installed at the Etna office is not an issue in this case.↩
2. All section references are to the Internal Revenue Code, as in effect for the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩