**NORTHERN STATES POWER COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil No. 4–95–741.**

United States District Court, D. Minnesota, Fourth Division.

Jan. 17, 1997.

Order Amending Adoption Order Jan. 23, 1997.

Steven Z. Kaplan and Richard D. Snyder, Fredrickson & Byron, P.A., Minneapolis, MN, for plaintiff.

Seth G. Heald, United States Department of Justice, Tax Division, Washington D.C., for defendant.

## ORDER ADOPTING REPORTS AND RECOMMENDATIONS OF THE MAGISTRATE JUDGE

TUNHEIM, District Judge.

This case involves two independent disputes regarding the federal taxes of plaintiff Northern States Power Company ("NSP"). The Court referred cross motions for summary judgment on both disputes to Magistrate Judge John M. Mason, who issued separate reports and recommendations on each dispute. The first Report and Recommendation, dated July 15, 1996, deals with what the parties refer to as the nuclear fuel assembly issue. The second Report and Recommendation, dated November 25, 1996, addresses a disagreement which has been called the DOE contracts issue.

The matter is before the Court on objections to each Report and Recommendation. The Court has reviewed *de novo* all of the objections to each Report and Recommendation on these dispositive pretrial matters, pursuant to 28 U.S.C. § 636(b)(1)(C) and D.Minn. LR 72.1(c)(2). For the reasons set forth below, the Court adopts each Report and Recommendation, grants summary judgment for NSP on the nuclear fuel assembly issue, and grants summary judgment for the United States on the DOE contracts issue.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is mandated when, after adequate time for discovery and upon motion, the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The parties have stipulated as to most of the facts relevant to both issues, so the motions considered by the Court present only legal issues.[1]

### I. The Nuclear Fuel Assembly Issue

■ The Report and Recommendation dated July 15, 1996 recommended entering judgment in favor of NSP finding that NSP is entitled to the investment tax credit and depreciation deductions claimed on its federal income tax returns for 1985 and 1986, respectively, with regard to 40 nuclear fuel assemblies which Westinghouse Electric Corporation delivered to NSP's Prairie Island nuclear steam-generated power plant in December, 1985, and with regard to the 44 nuclear fuel assemblies which Westinghouse delivered to the Prairie Island plant in December, 1986.

When NSP received these fuel assemblies, it proceeded to install them in the reactor core and test them before they could be used to generate electricity. Actual generation of electricity from the fuel assemblies did not begin until the year following the year of delivery. The United States argues that the investment tax credit and depreciation deductions related to each set of nuclear fuel assemblies should not be allowed until the years when they first used for the generation of electricity.

The Court agrees with the Magistrate Judge that the investment tax credit and depreciation deductions for each set of nucle-

---

1. The United States argues that factual disputes prevent summary judgment for NSP on the DOE contracts issue. However, the Court, like the Magistrate Judge, does not reach NSP's motion on the DOE contracts issue because it is granting the motion of the United States as to this issue.

ar fuel assemblies should be allowed in the years when they were delivered to NSP, because they were ready and available for use at that time. 26 C.F.R. § 1.167(a)–11(e)(1)(i) (depreciation deduction available when property is first placed in a condition of "readiness and availability"); 26 C.F.R. § 1.46–3(d) (investment tax credit available when property is placed in a condition of "readiness and availability").

The United States has also objected to the Magistrate Judge's recommendation that judgment be entered separately in this dispute, prior to the entry of judgment in the dispute involving DOE contracts issue. This objection is mooted by the fact that the Court is currently ruling on both disputes.

## II. The DOE Contracts Issue

■ The Report and Recommendation dated November 25, 1996 recommended entering judgment in favor of the United States on the separate claim regarding the tax treatment of costs related to the acquisition of nuclear fuel in the tax returns of NSP for the years 1985 and 1986. NSP objects to this recommendation.

This dispute is related to whether the costs of contracts for enriching nuclear fuel should be treated as capital expenses or deducted in the current year as ordinary losses or business expenses. NSP normally treats these costs as capital expenses, but it seeks to treat the cost of such contracts as ordinary losses or business expenses as to those contracts which were resold or assigned to third parties at a loss. The issue is whether NSP made a mistake which it can now correct when it treated the losses on such resales and assignments as capital expenses, rather than ordinary losses or business expenses.

NSP has long purchased services for the enrichment of uranium pellets for fueling nuclear reactors from the Department of Energy ("DOE"), in units known as "separative work units" or SWUs. In the tax years of 1985 and 1986, NSP had contractual obligations to buy more SWUs from the Department of Energy than it wanted or needed. NSP bought the SWUs required by the contract and resold them at a loss to third parties.

For financial reporting purposes, NSP has historically treated the acquisition costs for fuel assemblies, including the enrichment services, as capital expenses. NSP followed this practice in the tax years of 1985 and 1986, despite the fact that some SWUs were resold at a loss during those tax years. The SWU liabilities to the DOE, along with the offsetting credits reflecting the amounts for which NSP sold or assigned the unwanted SWUs, were included in a capital account known as a "work order."

When NSP's income tax department prepared the federal income tax returns for 1984 through 1986, it did not know about the sales and assignments of SWUs, so it utilized the fuel assembly reload work order figures without subtracting the net unrecouped expenses or losses from these transactions from the work order capital account. Consequently, the tax returns included those amounts in the capital cost of NSP's fuel assemblies on its tax returns. Had NSP's income tax department known of the sale and assignments of SWUs at the time, it would have reported the net unrecouped DOE SWU liabilities on those returns as currently deductible ordinary and necessary business expenses and/or ordinary losses.

When NSP's tax department became aware that NSP's fuel purchasing department had sold or assigned DOE SWUs to third parties during 1984 through 1986, the tax department timely filed claims for refund for tax years 1985 and 1986 seeking to change the treatment of the subject DOE SWU liabilities from capital expenses to currently deductible ordinary and necessary business expenses and/or ordinary losses. By the time the tax department became aware of the sales and assignments, however, it was too late for NSP to file a claim for refund for the 1984 tax year because the statute of limitations on refunds or credits, 26 U.S.C. § 6511, had expired as to that year.

The Court agrees with the Magistrate Judge and the United States that NSP is now seeking a change of accounting method which requires the consent of the Commissioner of Internal Revenue. 26 U.S.C. § 446(e). Regulations specify that a change involving a question of timing cannot be

made without consent, and they provide the example of "a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase." Treasury Regulation Section 1.446–1(e)(2)(ii)(b). The current case involves exactly this kind of change, albeit in the opposite direction. Consequently, NSP's failure to seek the consent of the Commissioner of Internal Revenue by filing a Form 3115 in a timely way is fatal to its claim.

NSP argues that it should be allowed to correct the use of an erroneous accounting treatment because its method was in error, and NSP objects to language in the Report and Recommendation suggesting that NSP is merely trying to change from one acceptable method to another. The Court agrees with the United States that it is irrelevant whether NSP could have properly elected to treat the losses from the SWU sales and assignments as capital expenses. Assuming this was purely erroneous, this is not the kind of error which can be corrected without consent, such as "mathematical or posting errors, or errors in the computation of tax liability." Treasury Regulation Section 1.446–1(e)(2)(ii)(b). Rather, NSP's asserted error was one involving the proper timing for the taking of a deduction. Changing an accounting method to correct such an error requires the consent of the Commissioner of Internal Revenue.

### ORDER

Based on the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that the Magistrate Judge's Report and Recommendation dated July 15, 1996 is **ADOPTED,** and the Magistrate Judge's Report and Recommendation dated November 25, 1996 is **ADOPTED.**

LET JUDGMENT BE ENTERED ACCORDINGLY.

### ORDER GRANTING RELIEF FROM JUDGMENT AND MODIFYING ORDER OF JANUARY 16, 1997

TUNHEIM, District Judge.

On January 16, 1997, the Court adopted two Report and Recommendations of the Magistrate Judge concerning this dispute regarding the federal taxes of plaintiff Northern States Power Company ("NSP") and directed entry of judgment in keeping with the Magistrate Judge's recommendations that judgment be entered pursuant to Fed. R.Civ.P. 54(b). Subsequently, the parties informed the Court that there are outstanding issues concerning the computation of interest on tax refunds which the parties did not raise in their objections. Consequently, judgment should not yet be entered.

Pursuant to Fed.R.Civ.P. 60(a), the Court relieves the parties from the final judgment, and the clerk is directed not to enter judgment until further order from the Court. The Order of January 16, 1997 is amended so as to reject the recommendations of the Magistrate Judge concerning the entry of judgment at this time. **IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

MASON, United States Magistrate Judge.

### INTRODUCTION

This matter came before the Court on April 11, 1996, on the parties cross-motions for summary judgment. The case has been referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Steven Z. Kaplan, Esq., appeared on behalf of the Plaintiff. Seth G. Heald, Esq., appeared on behalf of the Defendant.

The parties have presented two independent disputes to the court. The first relates the Nuclear Fuel Assemblies at the Prairie Island power plant and second relates to a contract between Northern States Power Company and the Department of Energy. The Court now issues this Report and Recommendation on the Nuclear Fuel Assembly issue. It will address the Department of Energy contract dispute in a subsequent Report and Recommendation.

The parties stipulated to undisputed facts for the purposes of the summary judgment

motions [Docket No. 35], which are summarized as follows.

Northern States Power Company ("NSP") has owned and operated a nuclear electric power plant in Prairie Island, Minnesota since 1974. The Internal Revenue Service ("IRS") issued notices of deficiency to NSP disallowing depreciation deductions and investment tax credits claimed by NSP on its 1985 and 1986 income tax returns. These disallowed amounts related to nuclear fuel assemblies manufactured for NSP's Prairie Island Plant in 1985 and 1986. On March 24, 1994, after receipt of the notices of deficiency, NSP paid with interest the additional tax requested. NSP timely filed claims for refund to recover the additional tax and interest paid to the IRS. The IRS denied NSP's claims and NSP filed this action for a tax refund under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. The amount involved in the dispute is approximately $8,500,000.

## FINDINGS OF FACT/REPORT

### A. Stipulated Facts

NSP's Prairie Island plant has two nuclear reactors housed in separate "containment" buildings. Each reactor has 121 individual fuel assemblies which comprise the "reactor core." The reactor is shut down every ten to sixteen months for refueling, at which time about one third of the total number of fuel assemblies are replaced. Shut downs of the reactor are scheduled well in advance and usually last about five to seven weeks. Each fuel assembly typically remains in the core for a total of three to five years.

The refueling process includes a number of steps including cooling the reactor, removing the old fuel assemblies, placing the new assemblies in the core, and properly configuring the new assemblies with the used assemblies. In addition, the core must undergo "start up physics testing" before power operations can be resumed. This testing verifies that the 121 assemblies have been properly positioned in the reactor core, and that the fission reaction generated by these assemblies is within the technical specifications of the plant. The testing is a necessary safety measure before the reactor can be restarted and produce sufficient heat to generate electricity.

The fuel assemblies used at NSP's Prairie Island plant during the years in question were manufactured by Westinghouse pursuant to a contract with NSP. The fuel assemblies consist of enriched uranium pellets which are inserted and sealed into metal rods. The metal rods are then fastened together in groups to form the assembly.

In December of 1985, NSP received a group of 40 fuel assemblies from Westinghouse for its next reload (Cycle 11) at Prairie Island. Each fuel assembly was fabricated by Westinghouse according to detailed specifications, and in accordance with the quality assurance plans of Westinghouse and NSP. After the manufacturing process was completed, in accordance with plans approved by the Nuclear Regulatory Commission, the assemblies were delivered to NSP. After receipt, NSP stored the assemblies in its "new fuel pit" before being transferred to the "spent fuel pool." The fuel assemblies were inserted into the reactor in March of 1986. The start-up of the fission reaction using these assemblies, and the 81 used assemblies, began on April 10, 1986 and the reactor reached full power on April 14, 1986.

In December of 1986, NSP received a group of 44 fuel assemblies from Westinghouse for its next reload (Cycle 12) at Prairie Island. These assemblies were stored in the new fuel pit and transferred to the spent fuel pool before being inserted into the reactor in April of 1987. Start-up of the fission reaction using these 44 fuel assemblies, and the 77 used fuel assemblies, began on May 28, 1987 and the reactor reached full power on June 1, 1987.

During the period in question, NSP reported its income under an accounting system required by the Federal Energy Regulatory Commission ("FERC"). Under the FERC, the date on which construction and manufacturing of the assemblies are deemed to have been completed is the date on which the last assembly in any group of replacement assemblies has been received at a utility company's plant. As of that date, all costs are considered complete for the purposes of determining the cost which may be depreciated. NSP

took a depreciation deduction in 1985 for the 40 fuel assemblies received in December of 1985, and a depreciation deduction in 1986 for the 44 fuel assemblies received in December of 1986. NSP also took an investment tax credit for the fuel assemblies acquired in 1985 and 1986.

## B. Discussion

The issue presented to the Court on the parties' cross motions for summary judgment is in what year the depreciation deductions and investment tax credit apply to the nuclear fuel assemblies purchased by NSP and delivered by Westinghouse to NSP in 1985 and 1986. There is no dispute that 40 fuel assemblies were received by NSP in December of 1985, and that they were placed into the reactor and used in 1986, and that 44 fuel assemblies were received in December of 1986, and that those were placed into the reactor and used in 1987.

Under 26 U.S.C. § 167, the cost of nuclear fuel assemblies is a capital expenditure for which a depreciation allowance is available. During the years in question, Section 38 and Section 46(a) of the Internal Revenue Code provided for an investment tax credit ("ITC") equal to ten percent of the acquisition cost of qualifying depreciable property. The purpose of the ITC was "to increase economic productivity, output, and growth by creating a tax incentive for the purchase of machinery, equipment and property used to produce goods and run a business." *Illinois Cereal Mills, Inc. v. Comm'r,* 789 F.2d 1234, 1236 (7th Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). In light of its purposes, Courts have construed the ITC liberally. *Id.* at 1239; *Sealy Power, Ltd. v. Comm'r,* 46 F.3d 382, 394 (5th Cir.1995).

In its simplest terms, by adopting the ITC, Congress hoped to induce companies to accelerate their capital purchases to boost the economy. As an inducement, the ITC provided that they could deduct the costs before this property was actually used, and they could do this even if they had a different accounting system. Depreciation deductions are governed by 26 C.F.R. § 1.167(a)–10(b) which states: "The period for depreciation of an asset shall begin when the asset is placed

in service and shall end when the asset is retired from service." Section 1.167(a)–11(e)(1)(i) of the Code of Federal Regulations defines when property is "placed in service":

> Property is first placed in service when first placed in a condition of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity or in a personal activity.

This regulation states that the provisions of § 1.46–3(d) regarding the ITC also apply to depreciation for the purposes of determining the date on which property is placed in service. § 1.167(a)–11(e)(1)(i).

The tax regulation applicable to investment tax credits is 26 C.F.R. § 1.46–3(d) which states:

> (1) For purposes of the credit allowed by Section 38, property shall be considered placed in service in the earlier of the following taxable years:
>
> (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or
>
> (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for specifically assigned function, whether in a trade or business, in the production of income in a tax-exempt activity, or in a personal activity.

The regulation states that if property meets the conditions of subdivision (ii), it shall be considered "placed in service" in that year even if the period for depreciation of the property begins in a succeeding year, or is computed under the "completed contract method, the unit of production method, or the retirement method." § 1.46–3(d)(1).

Section (2) of § 1.46–3(d) gives examples of property that shall be considered ready and available under the statute:

> (2) In the case of property acquired by a taxpayer for use in his trade or business (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function:

(i) Parts are acquired and set aside during the taxable year for use as replacements for a particular machine (or machines) in order to avoid operational time loss.

(ii) Operational farm equipment is acquired during the taxable year and it is not practicable to use such equipment for it specifically assigned function in the taxpayer's business of farming until the following year.

(iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects.

(iv) Reforestation expenditures (as defined in § 1.194–3(c)) are incurred during the taxable year in connection with qualified timber property (as defined in § 1.194–3(a)).

Section (2) further states that "materials and parts acquired to be used in the construction of an item of equipment shall not be considered in a condition or state of readiness and availability for a specifically designed function."

Based on these regulations, NSP argues that the fuel assemblies were placed in service when they were received in 1985 and 1986, because they were ready and available at the time it acquired or took possession of the completed assemblies in its Prairie Island plant. The IRS argues that the assemblies were not ready and available until they were placed into the reactor core and had been properly tested with the used assemblies already in the core.

In order to determine when the fuel assemblies were "ready and available," the court must first define the unit of property that is at issue. *See Madison Newspapers, Inc. v. Comm'r*, 47 T.C. 630, 1967 WL 1032 (1967) (the tax court considered "what" property was at issue in order to determine the time of its acquisition). In the present case, the group of new fuel assemblies acquired from Westinghouse is the unit of property at issue. Each group of fuel assemblies was the subject of a separate contract with Westinghouse. The contracts were complete upon delivery of the assemblies to the power plant. Westinghouse was not involved in the instal-

lation process or any post-acquisition testing of the fuel assemblies. Depreciation on the new fuel assemblies was computed separately from that on other components in the plant, such as the turbine, the reactor and the used fuel assemblies. Although the new fuel assemblies must be considered in light of their specifically designed function within the power plant, it is clear that they are a separate and independent unit of property. Therefore, the new fuel assemblies are the unit of property at issue, not the reactor core or the power plant as a whole.

The "ready and available" standard expressed in the regulations contemplates that property will qualify for the ITC at a time before it is actually used. Indeed, one of the theories behind the ITC is the belief that it will hasten spending commitments by advancing the date on which the deduction can be made to a date earlier than when the property will be used. The examples given in § 1.46–3(d) illustrate this theory. They describe property that is completed and acquired on one date but not put into use until a later date. In the examples, operational farm equipment acquired out of season, replacement parts for machinery, and equipment undergoing testing before use, are all entitled to the ITC in the year acquired, rather than in the year they are put to use.

Qualification for the tax credit at an earlier date is consistent with the purpose of the statute, to increase economic growth by creating a tax incentive for the purchase and acquisition of depreciable capital assets earlier than when they would be used. The purchases must be completed however. The "ready and available" condition thus assures that parties will finalize their transactions by taking possession of completed capital assets. Partially completed projects or paper transactions would not lead to the desired economic growth. The "ready and available" standard thus guards against the risk that the deduction will be taken "too early," just as the regulations also make clear that the taxpayer need not wait until the property is actually used.

In the present case, NSP's contract with Westinghouse was complete upon delivery of

the fuel assemblies to the Prairie Island plant. The fuel assemblies were fully assembled and had been fully tested in accordance with the quality assurance plans of NSP, Westinghouse and the Nuclear Regulatory Commission. No further testing or maintenance was required from Westinghouse. Although the assemblies still had to be installed in the reactor, and tested in conjunction with the existing fuel assemblies in the reactor core, the new fuel assemblies were themselves completely constructed and assembled.

The fuel assemblies were in "a state of readiness and availability" for their assigned function when they were acquired by NSP. The fuel assemblies, as a property unit, were fully completed. Like the examples in § 1.46–3(d), the fuel assemblies were acquired in a fully functional form and were ready and available to be used. The first use would include the testing procedures required as a matter of common sense and safety.

There is no case law considering these facts, but this conclusion is consistent with the examples in the regulations as well as cases which have found that operational equipment is entitled to the ITC and depreciation deductions in the year acquired rather than in the year it is actually used. *See Giles v. Comm'r,* 50 T.C.M. 1342 (CCH), 1985 WL 15165 (1985) (automobile purchased and acquired in December but not licensed or used until January); *SMC Corp. v. United States,* 80–2 USTC ¶ 9642, 1980 WL 1636 (E.D.Tenn.1980) *aff'd,* 675 F.2d 113 (6th Cir. 1982) (crane and metal shredder completed and assembled in one year but not used until the next year due to lack of electrical power at the facility); *Schrader v. Comm'r,* 34 T.C.M. 1572 (CCH), 1975 WL 2978 *aff'd* 582 F.2d 1374 (6th Cir.1978) (air conditioner acquired in the fall but not used until the following spring); *Sears Oil Co. v. Comm'r,* 359 F.2d 191 (2nd Cir.1966) (completed and outfitted barge not used in year acquired because it was frozen in the ice); *but see Siskiyou Communications, Inc. v. Comm'r,* 60 T.C.M. 475 (CCH), 1990 WL 112407 (1990) (telephone switching system installed in one year but not used until the next did not qualify for a depreciation deduction in the year installed).

In *Sears Oil Co. v. Comm'r,* 359 F.2d 191 (2nd Cir.1966), the taxpayer owned a barge that was completed and outfitted in 1957 but could not be used until May of 1958 because it was frozen in the water of a canal. The court noted that depreciation may be taken when property is available even if the property is not in fact in use. The court found that a depreciation deduction was allowable in 1957, reasoning that the barge was completed and subject to deterioration, and that even though it could not be used because of the ice, the lack of use was beyond the taxpayer's control.

In *Schrader v. Comm'r,* 34 T.C.M. 1572 (CCH), 1975 WL 2978, *aff'd* 582 F.2d 1374 (6th Cir.1978), an air conditioner was installed in a laundry business in September of 1960 but not used until warmer weather arrived in May of 1961. The tax court found the air conditioner was placed in service in 1960 and depreciation was allowable starting in September of that year.

In *SMC Corp. v. United States,* 80–2 USTC ¶ 9642, 1980 WL 1636 (E.D.Tenn.1980) *aff'd,* 675 F.2d 113 (6th Cir.1982), plaintiff purchased a scrap metal shredder and a link belt crane in the 1975 fiscal year. Both pieces of equipment were acquired, assembled and tested during fiscal 1975. However, the equipment could not be used because the electric company had not connected power sufficient to operate the equipment. The equipment was fully operation except for connection of the electric lines. The court, citing *Sears Oil,* found that the equipment was placed in service when operational in fiscal 1975. The court noted that the taxpayer should not be penalized for circumstances beyond taxpayer's control.

In *Giles v. Comm'r,* 50 T.C.M. 1342 (CCH), 1985 WL 15165 (1985), the taxpayer acquired a used automobile in 1979 which remained unlicensed and parked in his garage while he was on vacation. He did not use the automobile until January of 1980. The tax court, citing *Schrader* and *SMC Corp.,* found that

the automobile was placed in service in 1979 when Giles acquired it. *Id.* at 1344.[1]

The IRS argues that these cases do not reflect the rule but rather a narrow exception based on circumstances beyond the taxpayer's control. The courts in *Sears* and *SMC Corp.* considered the reasons the taxpayers failed to use the property. In *Giles,* the taxpayer did not use his car because he was on vacation. In *Schrader,* the taxpayer did not use the air conditioner because the weather was not sufficiently cool. The examples list property that is acquired by the taxpayer in its completed form but is not used for various reasons.

The IRS appears to argue that "readiness and availability" of completed equipment depends on the difficulty of installing such equipment and the amount of testing necessary before use. Thus, the IRS suggests a continuum of readiness based not on the property itself, but on the steps necessary before property may put into use. At one end of the continuum would be a fully functioning automobile which merely needs to be licensed and started. Farther along the continuum would be farm equipment which needs to be properly fastened to a tractor before use, or a metal shredder which has to be connected to an electrical power source. At the far end of the continuum would be the fuel assemblies, which need to be arranged with other assemblies in the reactor core and undergo physics testing before a fission reaction may be initiated. The IRS suggests that the procedures for using the fuel assemblies are so complicated that the fuel assemblies cannot be considered ready and available until all these procedures have been completed.

We do not believe this distinction is warranted by the statute or the regulations. If the position of the IRS were adopted, there would be no difference between the date when the property is "ready and available" for use and the date on which it is actually used. The legislation contemplates that the property will be "ready and available" on a date earlier than the date on which it is used.

Almost any property requires some review and inspection before it may actually be used. See § 1.46–3(d)(2)(iii). The fact that the testing process is more complex for some property than for other property does not justify applying a different standard to such property.

In the present case, the new fuel assemblies were ready to perform their specifically designed function upon delivery to the power plant. They were fully assembled, inspected, tested and available to be placed into the reactor core to serve as fuel for an electric generating nuclear reaction. The finality of the transaction which is to be assured by the "ready and available" standard is demonstrable. Although a complicated installation procedure had to be conducted before the fuel assemblies could be used to actually generate heat within the reactor, the self-contained units of 40 and 44 fuel assemblies were ready and available at the time NSP acquired them in their fully assembled form.

The IRS contends that the fuel assemblies should be considered component parts, which are not placed in service until the entire system is in a condition of readiness and capable of performing its designed function. *See, e.g., Sealy Power, Ltd. v. Comm'r,* 46 F.3d 382 (5th Cir.1995); *Hawaiian Independent Refinery v. United States,* 697 F.2d 1063 (Fed.Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983); *Siskiyou Communications, Inc. v. Comm'r,* 60 T.C.M. 475 (CCH), 1990 WL 112407 (1990).

The present case is distinguishable from those cases involving component parts of an uncompleted plant or business facility. In *Sealy Power, Ltd. v. Comm'r,* 46 F.3d 382 (5th Cir.1995), the court found that component parts of a power production facility were not "placed in service" until the entire system reached a condition of readiness. The court noted that the equipment in *Piggly Wiggly Southern, Inc. v. Comm'r,* 84 T.C. 739, 748 (CCH), 1985 WL 15341 (1985), *aff'd,* 803 F.2d 1572 (11th Cir.1986), had been placed in service with respect to the remodeled stores, but had not been placed in ser-

---

1. *See also Fort Howard Paper Co. v. Comm'r,* 36 T.C.M. 1711 (CCH), 1977 WL 3126 (1977) (structure built to house two turbines was "ready and available" in the year of full construction, although only one of two turbines was installed in that year).

vice with respect to the new stores. The court analyzed the "placed in service" date for the component parts based on the operation of the entire facility. The component parts were not placed in service until the facility was fully completed, licensed and began generating electricity.

In *Hawaiian Independent Refinery v. United States*, 697 F.2d 1063 (Fed.Cir.1983), the court found that offsite components of an oil refinery did not qualify for the investment tax credit. The offsite components included an offshore tanker-mooring facility connected to an oil refinery by pipelines, and pipelines for transporting petroleum to a storage facility. The court found that construction of the offsite components could not be separated from construction of the oil refinery itself, because they functionally formed a single piece of property for purposes of the ITC. *Id.* at 1069.

In *Siskiyou Communications, Inc. v. Comm'r*, 60 T.C.M. 475 (CCH), 1990 WL 112407 (1990), a communications company contracted for installation a digital telephone switching system known as the DMS–10. The DMS–10 unit was purchased to replace an existing telephone switching system. It was installed and title was passed to Siskiyou in 1984. When title passed, the system was fully capable of performing its designed functions but additional tests and outside wiring were required before it could be used on a regular basis. The outside wiring was completed in January of 1985, and the switch from the old system to the DMS–10 took place on January 21, 1985.

The tax court found that the DMS–10 was not placed in service until 1985. The court distinguished *SMC*, *Sears* and *Schrader* because the failure to use the equipment in those cases was beyond the taxpayers' control. The court found that the DMS–10 was a component part of an integrated operation which was not in operation until January of 1985. In so finding, the court relied on *Consumers Power Co. v. Comm'r*, 89 T.C. 710, 1987 WL 45172 (1987) and *Hawaiian Independent Refinery v. United States*, 697 F.2d 1063 (Fed.Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983), both of which involved the construction of new power plants.

In the present case the fuel assemblies are not component parts of a larger, *uncompleted* piece of equipment. The Prairie Island power plant and reactor have been completed and in operation since 1974. NSP was already generating power at the Prairie Island plant when the fuel assemblies were acquired. The unit of property, as noted, is the nuclear fuel assemblies. These were ready and available. The fuel assemblies, as individual units, were completed at the time they were acquired in December of 1985 and 1986, not when the reactor began generating electricity.

This Court is also not persuaded by the reasoning in *Siskiyou*. The *Siskiyou* court appears to have determined the "readiness and availability" of the DMS–10 unit based on the entire telephone operating system rather than the individual DMS–10 unit. In the present case, the nuclear fuel assemblies are depreciable units of property, independent of other parts of the nuclear plant. Unlike the parts in *Consumers Power*, and *Hawaiian Independent Refinery*, the fuel assemblies were not component parts of an uncompleted power plant. The Prairie Island plant was fully assembled and operational before the acquisition of the fuel assemblies. Accordingly, "readiness and availability" of the nuclear fuel assemblies must be considered independently. The fuel assemblies were ready and available at the time they were acquired in their fully assembled form.

IT IS HEREBY RECOMMENDED THAT:

1. NSP is entitled to the investment tax credit and depreciation deductions claimed on its federal income tax returns for 1985 and 1986, respectively, with regard to 40 nuclear fuel assemblies which Westinghouse Electric Corporation delivered to NSP's Prairie Island nuclear steam-generated power plant in December, 1985, and with regard to the 44 nuclear fuel assemblies which Westinghouse delivered to the Prairie Island plant in December, 1986. Plaintiff's Motion for Partial Summary Judgment on the Nuclear Fuel Assembly Issue [Docket No. 28] should be granted and Defendant's Motion for Par-

tial Summary Judgment on the Nuclear Fuel Assembly Issue [Docket No. 41] should be denied.

2. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court should expressly determine that there is no just reason for delay, and should order the entry of judgment on this claim.

July 15, 1996.

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties within ten days after service of a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing within ten days after service of the Report and Recommendation.

### REPORT AND RECOMMENDATION

MASON, United States Magistrate Judge.

This matter came before the Court on April 11, 1996, on Cross–Motions for Summary Judgment. The matter was referred to the undersigned by District Judge John R. Tunheim for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Steven Z. Kaplan, Esq., appeared on behalf of the Plaintiff; Seth G. Heald, Esq., appeared on behalf of the Defendant.

Two independent disputes were submitted to the Court on cross-motions for summary judgment. On July 15, 1996, this Court issued its Report and Recommendation concerning the first issue concerning the Investment Tax Credit on the Nuclear Fuel Assemblies [Docket No. 51], the appeal from which is under advisement. The following Report and Recommendation resolves the issue which the parties have called the Department of Energy contract dispute. Plaintiff and Defendant have each moved for Summary Judgment with respect to this issue [Docket Nos. 36 and 38].

### *Standards for Summary Judgment*

The standards for considering a motion for summary judgment have their foundation in the provisions of Rule 56 of the Federal Rules of Civil Procedure, as interpreted in a trilogy of cases decided by the Supreme Court in 1986. Summary judgment is appropriate if the materials submitted in support of the motion "show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986), the Supreme Court described the importance of the summary judgment procedure:

> "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."

On a motion for summary judgment, the moving party has the initial burden of establishing the "material facts" and demonstrating that there is not a "genuine" dispute as to whether those material facts are true. It is possible to satisfy that burden without filing affidavits. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. To defeat the motion, the opposing party must then establish that there is a "genuine" issue as to material facts. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106

S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Fed. R.Civ.P. 56(e).

The Court is guided in determining issues of materiality of the facts and the genuineness of the dispute by additional standards. "Where the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. at 1356. The Court considers the Motion for Summary Judgment based upon the materials presented in connection with the Motion. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court's inquiry should be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251.

These principles have been explained and applied by the Court of Appeals for the Eighth Circuit in numerous cases. *E.g.*, *Hartnagel v. Norman*, 953 F.2d 394, 395–96 (8th Cir.1992); *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir.1989); *cert. denied*, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). *Health Care Equal. Comm. of the Iowa Chiropractic Soc'y v. Iowa Medical Soc'y.*, 851 F.2d 1020, 1031–1032 (8th Cir. 1988). They were applied by this Court in its earlier Report and Recommendation [Docket No. 51], and will be applied here.

### FINDINGS OF FACT/REPORT

The parties stipulated to facts for the purposes of the Summary Judgment Motions [Docket No. 35], and Plaintiff submitted a document denominated Affidavit of Arne C. Sather Regarding DOE Contract Issue [Docket No. 40].

This action relates to the manner in which costs related to the acquisition of nuclear fuel shall be treated in the tax returns of NSP for the years 1985 and 1986. Nuclear generators are fueled by uranium pellets. The pellets are the end result of a process by which uranium ore is enriched to increase the relative percentage of the U 235 isotope which is necessary to sustain a fission reaction. The enriching process is performed by the Department of Energy, among others. The DOE charges for this service "at a specified dollar amount for each 'separative work unit' of service. A 'separative work unit' or 'SWU' is essentially that measure of separative processing work necessary to enrich" the uranium ore to the necessary level. Stipulation § 66. A company such as NSP is able to purchase and sell uranium ore with or without enrichment, and it can separately purchase and sell SWUs. After the uranium ore is enriched by the SWU process, it is placed in nuclear fuel assemblies.

On its tax returns in 1984, 1985 and 1986, Plaintiff included certain losses from the sale of SWUs with the cost of the SWUs it used in the fuel that year and other capital expenses, and deducted that cost as part of the depreciation of the capital item. NSP claims that this was an inadvertent mistake, and that losses from the sale of SWUs should have been separated each year from the cost of the SWUs used in the capitalized item, and deducted in that year. In 1994, NSP filed a claim for a refund for the years 1985 and 1986,[1] seeking to recover the difference between the taxes paid under the claimed mistaken method used, and the lower taxes that would have been payable under the preferred method. The total of taxes and interest claimed is approximately $1,800,000.

NSP seeks summary judgment in its favor on the ground that there is not a genuine issue of material fact concerning these allegations, and that it is therefore entitled to judgment as a matter of law. Defendant argues that there is a factual dispute as to whether NSP's initial decision as to the tax treatment of these items was a mistake, and that summary judgment in favor of NSP should be denied for that reason.

---

1. By that time it was too late to file a claim for refund for 1984.

Defendant also urges that the Court grant summary judgment in its favor (and that summary judgment should be denied to NSP) for a legal reason. Defendant argues that NSP's proposed change in the tax treatment of the SWUs would represent a change in accounting method, as to which the consent of the Commissioner of Internal Revenue must first be requested and obtained. No such consent was sought or obtained, so summary judgment should be denied to Plaintiff, and entered in favor of Defendant. NSP responds that it is not correct to characterize the basis for its demand for a refund as a change in accounting method, and that Defendant has misinterpreted applicable law.

NSP treated its costs for nuclear fuel (uranium ore and SWUs) as part of a capital "work order." The "work order" included the cost of the nuclear fuel assemblies, plus the cost of the uranium ore, and the SWUs used to enrich that uranium ore. The net losses from the transactions involving the purchase and sale of SWUs in that year were also added as expenses to the "work order." The "work order" was capitalized as a unit of property having a five-year life, and depreciated over that period. NSP "reasoned that because the DOE contract had been entered into [in] good faith and to secure a stable supply of SWUs for the benefit of NSP's customers the net unrecovered expenses or losses resulting from any SWU sale and assignment transactions should be borne by NSP's customers for rate purposes. The accounting mechanism for accomplishing that purpose in years 1984 through 1986 was to add the SWU contract liabilities to the cost of the fuel actually used in the production of electricity and to subtract therefrom the amount that NSP was able to recover from the third-party purchasers." Stipulation, § 75.

The losses on SWUs came about in the following way. NSP had purchased SWUs from the Department of Energy pursuant to written "take or pay" contracts. The latest contract was dated October 1, 1984. Although that contract reduced NSPs commitment to purchase SWUs, NSP determined that it must nonetheless sell on the open market some of the SWUs it had purchased

from the DOE. This was because it had agreed to purchase more than it needed, and because it had agreed to pay the DOE substantially more for SWUs than it would have to pay in the open market itself. By various means described more fully in the Stipulation of Facts, "NSP incurred in 1985 a net liability of $1,286,634.78 ... and in 1986 a net liability of $811,647.19, in fulfillment of its obligations under the DOE enriching services contract to pay for [SWUs] which it did not then want or need."

NSP was entitled to treat expenses on its tax returns in a way different from the way it treated those in the accounting records required by the Federal Energy Regulatory Commission (FERC) and state rate-making regulatory accounting rules. However, NSP accounted for these transactions on its 1984, 1985 and 1986 tax returns in the same way that it accounted for them under FERC and rate-making accounting rules.

Some time after filing these tax returns, NSP decided that it wished to treat the losses realized on the unused SWUs as expenses in the years in which the losses were incurred. On March 25, 1994, it filed the claim for refund which is the subject of this litigation. The claim for refund would account for the expenses associated with the DOE contract for SWUs as follows: The cost of SWUs used in a given year would be treated as capital expenses and depreciated over five years; the net loss on SWUs sold in that year would be treated as ordinary expenses, and fully deducted in that year.

## 1. THE COURT SHOULD GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.

### A. *The General Rule*

The parties agree that the general rule for taxpayers who seek to change from one method of accounting to another requires that the prior consent of the Commissioner of Internal Revenue must be obtained before making the change. This is accomplished by a taxpayer filing a Form 3115 in a timely way. 26 U.S.C. § 446(e); Treasury Regula-

tions § 1.446–1(e)(2)(*l*). Since NSP did not seek or obtain the consent of the Commissioner, Defendant is entitled to summary judgment unless there is some reason why this requirement should not be applied in this case.

The general rule requiring permission of the Commissioner has been applied in a number of cases which are similar to the facts presented in this case. In each of those cases, the Court concluded that summary judgment should be granted in favor of the government against the taxpayer, because the taxpayer had failed to obtain the consent of the government to the change in accounting method. *E.g., Diebold, Inc. v. United States,* 891 F.2d 1579 (Fed.Cir.1989); *Witte v. Commissioner of Internal Revenue,* 513 F.2d 391 (D.C.Cir.1975); *Hackensack Water Co. v. United States,* 352 F.2d 807 (Ct.Cl. 1965). The facts in *Hackensack* are illustrative.

In *Hackensack,* the taxpayer had filed its returns for years on an accrual basis. However, it had treated its payment of real estate taxes in a different way. Real estate taxes were deducted in the year paid, although they were assessed in the previous year. In 1953 and previous years, the taxpayer deducted the taxes which it paid in that year, which had been assessed the prior year. In 1954 (and subsequent years), the taxpayer sought to deduct the taxes that were assessed in that year. This meant that the taxes *paid* in 1953 were not deducted in any year. The taxpayer was not allowed to change its method because it did not have the permission of the Commissioner, even though it caused a harsh result, and even though the taxpayer sought to change from a disfavored "hybrid" system of accounting.

The Supreme Court has explained the reasons against permitting a change in accounting method, which supports the view that NSP's claim for refund involves a change in accounting method. The Supreme Court stated:

"Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns (§ 53(a)) to include the period allowed for recovering overpayments (§ 322(B)). There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method."

*Pacific National Co. v. Welch,* 304 U.S. 191, 194, 58 S.Ct. 857, 858, 82 L.Ed. 1282 (1938).

There are practical considerations which support the view that permission of the Commissioner is required before a change may be permitted. It is to be expected that when permission of the Commissioner is sought, an administrative process will result in resolution of any adjustments to returns for other years which may be required in order to accommodate the change for the proposed years. These and other administrative details are best resolved by the process adopted by Congress, rather than seeking judicial resolution on a case by case basis.

**2. Are There Exceptions—Do Any Apply?**

NSP argues that where a taxpayer has overpaid its correct liability by adopting an erroneous method, the taxpayer may elect one of two processes for changing the erroneous method; it may comply with the requirements of the statute by filing Form 3115 in a timely way; or it may file a claim for a refund, followed if necessary by litigation to obtain the refund. This Court disagrees. It is recommended that the District Court conclude that the only permissible process is the process prescribed by statute, and that summary judgment be granted to Defendant, and denied to Plaintiff, upon the ground that Plaintiff failed to follow that process. In making that recommendation, we point out that some courts have found that there are exceptions to the rule requiring the consent of the Commissioner. We are not certain that the exceptions which have been allowed can be reconciled with the statute and the regulations thereunder. This has led to some analytical confusion.

We consider directly below each of the arguments advanced by NSP seeking an exception to the general rule in this case. We also recommend that summary judgment be granted in favor of Defendant after considering these arguments. Even if the claimed exceptions were well founded legally, they are not available to NSP under the facts of this case.

*No Formality Required.* NSP argues that it did not "consciously or deliberately adopt a method of tax accounting," so it may not now be said to be seeking to change the method of accounting. We conclude that no particular formality beyond the filing of a return is required to constitute the adoption of a method of accounting. NSP elected to treat the subject expenses as capital expenses. The IRS need not prove nor need the Court find that the action taken by the taxpayer was done only after consultation with its tax department. When a taxpayer files a tax return and treats an expense as either a current or a capital expense, that treatment constitutes a method, and it is adopted by the filing of the return.

"NSP's expenditures for coal or oil are treated as a not-for-sale inventory item when acquired and stored and as an expense when they have been consumed in NSP's operations. For both financial and tax return reporting purposes, NSP has reported any gains from the sales of unneeded or unwanted coal or oil as ordinary income and has reported any losses from such sales as current expenses." Stipulation, § 80. NSP was aware that it had a choice to treat its expenditures for nuclear fuel in the same way that it treated its expenses for coal and oil, but it did not do so in its 1984, 1985 and 1986 tax returns. By filing its claim for refund, NSP is seeking to change from capitalizing nuclear fuel expenses to treating some of them as current expenses, the method it used for coal and oil. This is a change in method within the meaning of Section 446(e) of the Internal Revenue Code of 1954.

*No Errors Are Involved.* We are not persuaded that that there is a genuine issue of fact as to whether NSP is merely seeking to correct an error, rather than to change a method of accounting. We do not accept NSP's argument that its original method of accounting for the losses on sale of SWUs was in error. NSP had concluded that it was necessary for NSP to take action to insure that it had a supply of nuclear fuel. It also concluded and continues to maintain that whatever it paid for the nuclear fuel which it actually uses in a given year, including the SWUs, should be a capitalized cost.

NSP entered into its contract with the DOE to insure that it had arranged for sufficient SWUs to enrich the ore NSP would use in its Nuclear Fuel Assemblies. The cost of the SWUs was increased in relative rather than absolute terms: the higher cost in any given year would depend upon NSP's success in the net result of transactions involving the "take or pay" contract.

Hypothetically, NSP agreed to pay to the DOE $15,000 for SWUs. If NSP needed and used 150 SWUs in a given year, it would capitalize the entire $15,000 cost. If its need decreased, such that it needed and used only 100 SWUs in a given year, there is not a strong reason why it should be said that the "cost of the SWUs actually used" was $10,000 and should be capitalized, and the other $5,000 was a separate "net loss" which should be treated as a current expense. It is just as sensible (as NSP itself concluded in the rate-making context) to treat the entire $15,000 as the cost necessary to be paid to obtain the SWUs used in the Nuclear Fuel Assemblies.

NSP treated all costs of SWUs as capital costs, a permissible method. Another permissible method might have been to treat all costs of SWUs as current expenses, as NSP did with coal and oil. It proposes a third alternative, by which it would by some method allocate the expense of SWUs between those used in the Nuclear Fuel Assemblies, and the losses suffered in the open market, treating the former as capital expenses and the latter as current expenses. This proposal is a change in method.

We have considered NSP's argument that what is at stake is "correction of mathematical or posting errors, or errors in the computation of tax liability ..." under Treasury Regulation § 1.446–1(e)(2)(ii)(b). The plain text of this regulation does not include

changes of the kind contemplated by NSP. Instead, the argument is inconsistent with a later part of that same regulation, which describes a change from current expense to depreciation as a change in method.

> "On the other hand, for example, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting."

If a change from current expense to depreciation is a change in method, surely a change in the other direction is also a change in method.

The fact that other tax years would be affected by the change also leads to the conclusion that a change in method is effected. *See* Treasury Regulation § 1.446-1(e)(3)(i) and 26 U.S.C. § 481(a); *Knight-Ridder Newspapers v. United States*, 743 F.2d 781, 797–99 (11th Cir.1984).

***Permission Is Required Even If Old Method Erroneous.*** For purposes of considering its own motion for Summary Judgment, Defendant was willing to stipulate that NSP's treatment of the expenditures was erroneous. The government insisted, however, that this would be a factual issue for trial in considering NSP's motion for summary judgment. We agree with Defendant that even given that assumption, the Government is entitled to summary judgment.

NSP relies upon cases which are not presented by the facts of this case. In *Thompson–King–Tate, Inc. v. United States*, 296 F.2d 290 (6th Cir.1961), the Court allowed a taxpayer to change from an unpermitted method of accounting to the single method which was permitted. It reasoned that where "income must be reported in a certain way and the taxpayer erroneously reports it in a different way" this is an error, not an election, so a change is not a change in a method of accounting. *Id.* at 294. To the same effect, *see*, *Korn Industries, Inc. v. United States*, 532 F.2d 1352 (Ct.Cl.1976); *Gimbel Bros. Inc. v. United States*, 535 F.2d 14 (Ct.Cl.1976); and *Evans v. Commissioner of Internal Revenue*, 55 T.C.M. 902, 1988 WL 49303 (1988). This theory has not often been applied. Whatever may be the validity of this theory, it is not applicable in this case for a number of reasons. Most important, in this case NSP could have treated these expenses in more than one way. It is not "escaping" from an impermissible method of accounting to the only permissible method of accounting, nor from a method involving "egregious errors" or a method that "could not have been elected."

For all of the above reasons, it is recommended that summary judgment be granted in favor of Defendant and against Plaintiff with respect to the issue concerning the Department of Energy Contract dispute.

IT IS HEREBY RECOMMENDED THAT:

1. Plaintiff's Motion for Summary Judgment [Docket No. 38] be denied, and Defendant's Motion for Summary Judgment [Docket No. 36] be granted with respect to the issue concerning the Department of Energy Contract Dispute.

2. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court should expressly determine that there is no just reason for delay, and should order the entry of judgment on this claim.

3. The parties should be directed to schedule a pretrial conference with the Magistrate Judge to establish a process by which the remaining issues herein, if any, may be resolved.

Nov. 25, 1996.

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by December 11, 1996** written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and

file a complete transcript of the hearing by December 11, 1996.